[No. 49359–6. En Banc. October 4, 1984.]

RITA RENE MARTIN, ET AL, *Appellants,* V. ABBOTT
LABORATORIES, ET AL, *Respondents.*

*Manza, Moceri, Gustafson & Messina, P.S.,* by *Michael S. Manza, John S. Glassman,* and *John L. Messina,* for appellants.

*Reed, McClure, Moceri & Thonn, P.S.,* by *Hugh McClure,* and *Keating, Bucklin & McCormack,* by *Jane E. Gilbertsen,* for respondents Abbott Laboratories, et al.

*Helsell, Fetterman, Martin, Todd & Hokanson,* by *William A. Helsell* and *Karen J. Vanderlaan* (*Crosby, Heafey, Roach & May,* by *Richard J. Heafey* and *Peter W. Davis,* of counsel), for respondent Eli Lilly.

*Williams, Lanza, Kastner & Gibbs,* by *Joseph J. Lanza, Douglas A. Hofmann,* and *Karen J. Feyerherm,* for respondent E. R. Squibb & Sons.

*Richard J. Dunlap* and *R. Scott Fallon,* for respondent Kirkman Laboratories.

*Schwabe, Williamson, Wyatt, Moore & Roberts,* by *Frank W. Draper* and *Elizabeth K. Reeve,* for respondents Merck and Co., et al.

*Bradford M. Gierke* and *Sandra Bobrick* (of *Gierke, Curwen, Metzler & Bobrick*), for respondent Raway Pharmaceutical Co.

*F. Lee Campbell* and *David D. Swartling* (of *Karr, Tuttle, Koch, Campbell, Mawer & Morrow, P.S.*), for respondent Rexall Drug Co.

*Gordon, Thomas, Honeywell, Malanca, Peterson & O'Hern,* by *Mark G. Honeywell,* for respondent Stanlabs Pharmaceutical Co.

*Mullin, Etter & Cronin, P.S.,* by *Ronald K. Mullin,* for respondent Upjohn Co.

*Hackett, Beecher, Hart, Branom, Vavricheck & Drury,* by *John A. Drury,* for respondents Ludwig, et al.

*Tewell, Thorpe & Findlay, Inc., P.S., Duane Tewell,* and *Paul F. Cane,* for respondents Breon Laboratories and Winthrop Laboratories.

*Williams, Lanza, Kastner & Gibbs,* by *Mary H. Spillane* and *Don T. Mohlman,* for respondents Ayerst Laboratories and Wyeth Laboratories.

*Bogle & Gates, Ronald T. Schaps,* and *William G. Clark,* for respondent Armour Pharmaceutical Co.

DORE, J.—This case concerns whether plaintiffs, allegedly injured by the drug diethylstilbestrol (DES), have a cause of action against numerous DES manufacturers when they cannot identify the specific manufacturer of the DES ingested. The trial court held that plaintiffs had stated a cause of action when it denied summary judgment as to two drug manufacturers, finding material issues of fact under a theory of alternate liability.

We reject the application of alternate liability. We hold that plaintiffs have stated a cause of action under a theory of recovery announced in this opinion. For the reasons discussed below, we affirm in part and reverse in part.

## TRIAL COURT PROCEEDINGS

Rita Rene Martin was born on October 4, 1962. Her mother, Shirley Ann Martin, obtained a prescription for and ingested DES from May 1962 until the date Rita Martin was born. On January 4, 1980, Rita was diagnosed as suffering from clear cell adenocarcinoma of the vagina. On February 21, 1980, as a result of the cancer, Rita underwent

a radical hysterectomy, pelvic node dissection, and partial vaginectomy.

Like many other women who have pursued judicial remedies for injuries they allege were caused by DES, Shirley Martin cannot remember which drug company manufactured the DES she ingested. Moreover, because of the passage of time and because DES was marketed generically, neither Shirley's physician nor her pharmacist, William Ludwig, Jr., f/d/b/a Lakewood Pharmacy, Inc., can remember which company manufactured or marketed the drug Shirley ingested. The only thing Shirley Martin can substantiate is that she took the drug in 100 mg. doses.

Shirley and Rita Martin sued numerous drug companies on the theories of negligence, strict liability and breach of warranty, for personal injuries, pain, suffering, and destruction of the parent–child relationship.[1] The Martins alleged that all of the pharmaceutical companies were liable for their injuries because of the companies' concerted or joint action to gain FDA approval and to market DES. The Martins allege this concerted action is established by (1) the manufacturers' collaboration in testing and marketing DES, (2) the marketing of DES on a mutually agreed–upon formula, and (3) the marketing of DES as a fungible item which led to the selling of DES without reference to the brand prescribed.

The Martins also sued pharmacist Ludwig on the theory of strict products liability for selling an unreasonably dangerous product.

Defendants Summers Laboratories, Inc., and Hill Pharmaceutical, Inc., were dismissed by stipulation. Corvit

---

[1]The defendants included Abbott Laboratories; Approved Pharmaceutical Corporation; Carnrick Laboratories, Inc.; Corvit Pharmaceuticals; Eli Lilly and Company; Kirkman Laboratories, Inc.; Merck and Company, Inc.; Hill Pharmaceutical, Inc.; Penn Herb Company, Ltd.; Pharmex, Inc.; Raway Pharmaceutical Company; Stanley Drug Products, Inc.; Stanlabs Pharmaceutical Company; E. R. Squibb & Sons, Inc.; Summers Laboratories, Inc.; The Upjohn Company; Armour Pharmaceutical Company; Rexall Drug Company; Ayerst Laboratories, Inc.; Breon Laboratories, Inc.; Winthrop Laboratories; and Wyeth Laboratories, Inc.

Pharmaceuticals was never served with process and is not a party to this appeal. Penn Herb Company, Ltd., was dismissed when it became apparent that it was not a proper defendant. Approved Pharmaceutical Corporation and Pharmex, Inc., are in default because they were served but never appeared to defend.

The remaining defendants moved for summary judgment, generally alleging that the Martins' inability to identify the correct manufacturer of the drug Shirley Martin ingested was fatal to the Martins' cause of action. The trial judge granted summary judgment to all of the remaining defendants except Stanley Drug Products, Inc., Kirkman Laboratories, Inc., and pharmacist Ludwig.

The trial judge dismissed defendants who had proved they did not market DES in the dosage or form ingested by Shirley Martin, which included Abbott Laboratories; Carnrick Laboratories, Inc.; Eli Lilly and Company; Merck and Company, Inc.; Rexall Drug Company; The Upjohn Company; and Raway Pharmaceutical Company. The trial judge further dismissed those defendants who had proved that they did not market DES for accidents of pregnancy, which included Armour Pharmaceutical Company; Ayerst Laboratories, Inc.; Wyeth Laboratories, Inc.; Breon Laboratories, Inc.; and Winthrop Laboratories. Summers Laboratories, Inc., was dismissed, as the product they manufactured was not marketed in the state of Washington. E. R. Squibb and Sons, Inc., was dismissed on the basis that the retail price charged Shirley Martin for DES purchased from Ludwig's pharmacy was less than the wholesale price for Squibb's trademark DES. Stanlabs Pharmaceutical Company was dismissed upon a finding that no material issue of fact existed as to successor liability for the acts of Stanley Drug Products, Inc.

As to the two remaining defendants, the trial judge held that, under the theory of "alternate liability", there were material issues of fact as to the liability of Stanley Drug Products, Inc., and Kirkman Laboratories, Inc.

Although the trial judge found that there were arguable

questions of fact concerning liability for concerted action, the trial judge rejected this theory because it would result in joint and several liability for a number of defendants who could prove that they did not manufacture the DES that caused plaintiffs' harm, and because he believed the theory of "alternate liability" more fairly accommodated the facts of this case.

The trial court also found material issues of fact as to Ludwig's liability as the dispensing pharmacist. Finding no just reason for delay, the trial court entered a final judgment pursuant to CR 54(b).

The Martins filed a notice of appeal in this court on March 1, 1983. At the same time, Stanlabs Pharmaceutical Company, Kirkman Laboratories, Inc., and Ludwig filed notices of appeal in Division Two of the Court of Appeals. Both appeals are now consolidated for review here.

The Martins endorse the trial court's ruling, but continue to argue that they have raised issues of fact which would justify even broader liability under concerted action, enterprise, or market–share theories of liability. They urge this court to reverse the trial court's order as to those respondents dismissed on summary judgment. The respondents argue that the trial court correctly dismissed the majority of the pharmaceutical companies joined in this action. Respondents contend, among other things, that adoption of any theory that would impose industry–wide liability would hamper the development of new drugs, would impose enormous potential costs on pharmaceutical companies, and would not serve as an incentive to use greater care in producing drugs. Finally, respondents urge the Martins to seek broader liability through legislative enactment.

Stanley Drug Products, Inc., and Kirkman Laboratories, Inc., contend that the trial judge erred in not granting summary judgment in their favor. Their basic contentions are that neither was identified as the actual defendant that manufactured or distributed the DES ingested by Shirley Martin, and the probability that either was such party is

very small, in that they are but two manufacturers from a large potential number of defendants.

### DEVELOPMENT AND MARKETING OF DES

Crucial to an understanding of this litigation and resolution of the issues is the history of the development and marketing of DES. Much of the history is developed in the record here, and detailed in numerous reported cases and law journals.[2]

Estrogen is a female sex hormone present in varying amounts in the body of every woman. This hormone is crucial to female sexual development and fertility. Natural estrogens were first isolated outside the human body in the 1920's. Doctors initially used the hormone to treat menopausal symptoms in women. Natural estrogen therapy, however, had several drawbacks. The process of isolating the hormone was very costly. Furthermore, natural estrogens could only be administered through injections into the buttocks, often resulting in painful abscesses.

In the late 1930's, a group of British scientists discovered DES, a synthetic compound which shares some of the characteristics of estrogen. DES could be produced at a fraction of the cost of isolating natural estrogens and could be orally administered. It was never patented.

Approval of the Food and Drug Administration (FDA) was required before DES could be marketed in the United States. Pursuant to the Federal Food, Drug, and Cosmetic Act, 52 Stat. 1040 (1938), each company wishing to market DES had to file a New Drug Application (NDA) detailing the proposed uses of the drug, clinical data establishing its safety and efficacy, the drug's chemical composition, meth-

---

[2]*See, e.g., Ryan v. Eli Lilly & Co.,* 514 F. Supp. 1004 (D.S.C. 1981); *Ferrigno v. Eli Lilly & Co.,* 175 N.J. Super. 551, 420 A.2d 1305 (1980); *Lyons v. Premo Pharmaceutical Labs, Inc.,* 170 N.J. Super. 183, 406 A.2d 185, *cert. denied,* 82 N.J. 267 (1979); *Payton v. Abbott Labs,* 386 Mass. 540, 437 N.E.2d 171 (1982); Scheiner, *DES and a Proposed Theory of Enterprise Liability,* 46 Fordham L. Rev. 963 (1978); Note, *Industry–Wide Liability and Market Share Allocation of Damages,* 15 Ga. L. Rev. 438 (1981); Robinson, *Multiple Causation in Tort Law: Reflections on the DES Cases,* 68 Va. L. Rev. 713 (1982).

ods of manufacturing it and proposed labeling.

The first NDA for DES was filed in 1939. By the end of 1940, ten firms had applied. The NDAs sought authorization to market and distribute DES for four purposes: the treatment of postmenopausal symptoms, senile vaginitis, gonorrheal vaginitis, and suppression of lactation. None of the proposed uses relate to problems of pregnancy.

All indications from the FDA in 1939 suggested that the FDA would review each manufacturer's NDA separately. This meant that each firm had to stand on the clinical data it submitted in its own NDA.

In late 1940, the FDA indicated that it was considering requesting the drug companies to pool their clinical data on DES. On December 20, 1940, the FDA convened a meeting with the drug companies, at which it formally requested that the companies submit their clinical data jointly in a "master file". The FDA believed that the individual NDAs did not contain sufficient clinical data to properly evaluate the safety and efficacy of DES. Pooling of the data, in the FDA's view, would eliminate this problem as well as expedite its evaluation of DES.

The FDA made three other requests of the drug companies at this time. The first was that each company use the same United States pharmacopeia standard to establish the chemical identity of the drug. The second was that they develop uniform labeling regarding the indications for use of the drug and recommended dosage. The third was that they place a provision in their NDAs authorizing the FDA to use the materials gathered by each firm in considering any other NDAs that might be filed. The companies, for the most part, complied with these additional requests.

A "small committee" of representatives of those firms which had filed NDAs coordinated the pooling of clinical data and submitted the "master file" to the FDA. The FDA approved the marketing of DES for uses unrelated to problems of pregnancy in late 1941. Thereafter, the "small committee" was disbanded.

Experimental use of DES as a miscarriage preventative

began in the early 1940's. Several drug companies supplied DES to independent researchers for such experimentation. The drug companies also sent representatives to medical conferences on this topic.

The first supplemental NDAs for the use of DES as a miscarriage preventative were filed in 1947. Only a few companies conducted their own experiments to establish the safety and efficacy of DES for this purpose. Among these, none tested DES on pregnant laboratory animals. The applicants relied instead upon published studies done by independent researchers at medical schools to support their applications. The supplemental NDAs did not refer to the "master file" of clinical data that had been submitted with the 1941 NDAs. The FDA's policy in reviewing supplemental NDAs, however, was to take into consideration all of the material that it had in support of the original NDAs.

The FDA began approving the supplemental NDAs in July 1947. Soon thereafter, DES was marketed as a miscarriage preventative. Some companies marketed the drug under a trade name; others marketed it generically. Several companies supplied DES to competitors. Because the DES compounds produced by the drug companies were chemically identical, pharmacists often filled prescriptions for DES with whatever company's drug was in stock, a practice that the firms were aware of. None of the companies warned physicians about the possibility of carcinogenic or other risks to the offspring of women who took DES.

The number of firms marketing DES has fluctuated considerably over the years. Estimates are that up to 200 or 300 companies manufactured and marketed DES between 1947 and 1971.

In 1952, the FDA decided that DES was no longer a "new drug" within the meaning of the Federal Food, Drug, and Cosmetic Act. This meant that companies wishing to market DES for the first time would not have to file NDAs.

In 1971, Dr. Arthur Herbst and several other physicians published a study linking the outbreak in young women

of clear cell adenocarcinoma, a form of cancer, with the ingestion of DES by their mothers during pregnancy. In November of that same year, the FDA required the drug companies to include a statement on all labels that "DES is contraindicated for use in the prevention of miscarriages." Today, the FDA continues to permit the use of DES in treatments unrelated to problems of pregnancy.

IDENTIFICATION OF CULPABLE DEFENDANT

Traditional products liability theory has always required a reasonable connection between the injured plaintiff, the injury–causing product, and the manufacturer of the injury–causing product. "An essential element of the plaintiff's cause of action for negligence, or for that matter for any other tort, is that there be some reasonable connection between the act or omission of the defendant and the damage which the plaintiff has suffered." W. Prosser, *Torts* § 41, at 236 (4th ed. 1971) (hereinafter cited as Prosser).

The majority of the courts in DES litigation have followed the traditional approach, finding no cause of action when the plaintiff cannot identify the particular manufacturer of the pills which caused her injury. *See Gray v. United States,* 445 F. Supp. 337 (S.D. Tex. 1978); *Namm v. Charles E. Frosst & Co.,* 178 N.J. Super. 19, 427 A.2d 1121 (1981); *Ryan v. Eli Lilly & Co.,* 514 F. Supp. 1004 (D.S.C. 1981); *Mizell v. Eli Lilly & Co.,* 526 F. Supp. 589 (D.S.C. 1981); *Morton v. Abbott Labs.,* 538 F. Supp. 593 (M.D. Fla. 1982); *Pipon v. Burroughs–Wellcome Co.,* 532 F. Supp. 637 (D.N.J. 1982); *Tidler v. Eli Lilly & Co.,* 95 F.R.D. 332 (D.D.C. 1982); *Payton v. Abbott Labs,* 386 Mass. 540, 437 N.E.2d 171 (1982).

Notwithstanding this general rule, four theories have been proposed, and in some cases adopted, to give DES plaintiffs a cause of action. These theories are (1) alternate liability, (2) concerted action, (3) enterprise liability, and (4) market–share liability. *See generally* Note, *Market Share Liability: An Answer to the DES Causation Problem,* 94 Harv. L. Rev. 668 (1981).

## ALTERNATE LIABILITY

Alternate liability arose as a cure for plaintiff causation problems. Prosser, at 243. The theory was introduced in *Summers v. Tice,* 33 Cal. 2d 80, 199 P.2d 1, 5 A.L.R.2d 91 (1948) and incorporated in Restatement (Second) of Torts § 433B(3), at 441–42 (1965):

> Where the conduct of two or more actors is tortious, and it is proved that harm has been caused to the plaintiff by only one of them, but there is uncertainty as to which one has caused it, the burden is upon each such actor to prove that he has not caused the harm.

In its classic application, the theory requires each hunter who negligently shot at plaintiff to prove that his bullet did not cause the injury. Failing such proof, both are liable. *Summers,* at 88.

The rule of *Summers* requires that in cases where all defendants are equally culpable, and their negligence precludes an innocent plaintiff from identifying them, basic considerations of fairness demand that the burden of proof shift from plaintiff to defendant. Defendants unable to meet the burden of proof are found jointly and severally liable.

Alternate liability has been recognized, but not as of yet applied in this state. *See Clift v. Nelson,* 25 Wn. App. 607, 608 P.2d 647, *review denied,* 93 Wn.2d 1030 (1980); *Phennah v. Whalen,* 28 Wn. App. 19, 621 P.2d 1304 (1980), *review denied,* 95 Wn.2d 1026 (1981). In *Clift,* the court held that alternate liability was inapplicable because the plaintiff could not establish that all named defendants had been tortious and the possibility that the tortious act was committed by a party not named as a defendant.

Several DES cases have discussed alternate liability as a means of providing DES plaintiffs with a cause of action.

In *Abel v. Eli Lilly & Co.,* 418 Mich. 311, 343 N.W.2d 164 (1984), the trial court denied the plaintiffs a cause of action for failing to identify which of the named defendants had manufactured the specific harmful product. The two theories argued on appeal were concerted action and alternate

liability. The basis of the alternate liability theory was that all defendants acted wrongfully in producing and marketing a defective product, and that each plaintiff was injured by the product of one of the several defendants. The plaintiffs argued that because all defendants acted wrongfully, even though only one actually caused the injury, all should be jointly and severally liable just as were the hunters in *Summers*. Recognizing that the plaintiffs faced an enormous burden of proof as well as the problem of apportionment of damages if they were to prevail, the Michigan court nevertheless allowed the cause of action to proceed. Its decision was premised on the expressed policy of favoring an innocent plaintiff over a wrongdoer when injustice was inevitable. As distinguished from other DES litigation where the theory of alternate liability had been asserted, the plaintiffs in *Abel* alleged that they had named all the known manufacturers of DES whose products were distributed during the relevant time period, and that one or more of the named defendants had caused the harm. *Abel*, 343 N.W.2d at 174. This allegation that all the defendants were before the court most likely facilitated the court's acceptance of the alternate liability theory as sufficient to state a cause of action.

A showing that all possible tortfeasors are before the court was not required, however, in one DES case. A New Jersey superior court, in *Ferrigno v. Eli Lilly & Co.*, 175 N.J. Super. 551, 420 A.2d 1305 (1980), interpreted existing New Jersey law to allow the plaintiffs to proceed on a theory of alternate liability despite a failure to show that all potential defendants were before the court. The court held that under existing New Jersey law a plaintiff's cause of action survives an inability to identify the precise causative agent and the possibility that the precise causative agent is not among the defendants before the court. *Ferrigno*, at 567. The court also proposed strong policy reasons to justify allowing the suit to proceed, one of which was the favoring of recovery by innocently injured plaintiffs over allegedly culpable defendants. If the DES plaintiff proved

her allegations, it reasoned, none of the defendants could be considered truly innocent. The judge also relied on the New Jersey "single indivisible injury" rule, which essentially tolerates the possibility that "one wrongdoer can escape liability altogether while another tortfeasor may be compelled to pay more than his actual share of the damages . . ." *Ferrigno,* at 570. The decision did, however, enumerate specific methods by which a defendant in a DES case could exculpate itself. Among the methods enumerated were: identification of the actual manufacturer; proof that defendant company never manufactured the drug involved; proof that defendant did not manufacture DES until after the plaintiff's birth; proof that the product never reached the outlet where the plaintiff's mother purchased the DES; or proof that defendant never manufactured a drug of the physical description indicated by the plaintiff. *Ferrigno,* at 571–72. In conclusion, the court in *Ferrigno* found that existing New Jersey precedent allowed acceptance of the theory of alternate liability in DES cases where the defendant cannot be identified or may not actually be before the court.

In contrast to *Ferrigno,* other courts have not recognized the alternate liability theory. The New Jersey Superior Court, appellate division, in *Namm v. Charles E. Frosst & Co.,* 178 N.J. Super. 19, 427 A.2d 1121 (1981), rejected the reasoning of the lower court in *Ferrigno* and dismissed the claim before it on the ground that it was possible that the company which had actually made the particular injury–causing DES had not even been named as a defendant. The court went on to say that to apply the alternate liability theory would result in the taking of the property of all the named defendants in order to pay for harm which may have been caused by only one of the defendants or even by one who is not a party to the lawsuit, who is unknown to the defendants, over whom they have no control or even any meaningful contact. *Namm,* at 33. The court indicated that any departure from traditional concepts and basic principles of tort law should be undertaken by the court of

last resort and not by the appellate division.

The California Supreme Court in *Sindell v. Abbott Labs.,* 26 Cal. 3d 588, 607 P.2d 924, 163 Cal. Rptr. 132, *cert. denied,* 449 U.S. 912 (1980), held that the traditional alternate liability theory of *Summers,* as incorporated in the Restatement (Second) of Torts § 433B(3) (1965), could not be employed to hold drug manufacturers liable in DES actions where all possible defendants were not before the court. *Sindell,* at 602–03. *Accord, Pipon v. Burroughs–Wellcome Co.,* 532 F. Supp. 637, 638–39 (D.N.J. 1982); *Ryan v. Eli Lilly & Co.,* 514 F. Supp. 1004, 1016 (D.S.C. 1981); *Morton v. Abbott Labs.,* 538 F. Supp. 593, 598–99 (M.D. Fla. 1982).

The Wisconsin Supreme Court in *Collins v. Eli Lilly Co.,* 116 Wis. 2d 166, 342 N.W.2d 37, *cert. denied,* ___ U.S. ___, 83 L. Ed. 2d 51, 105 S. Ct. 107 (1984) rejected the traditional alternate liability theory because it contemplated that all possible defendants be before the court. *Collins,* at 183–84. The court did, however, adopt a "risk contribution" theory which may be considered a modification of alternate liability. The court held that the plaintiff need commence suit against only one defendant and allege the following elements:

> [1] that the plaintiff's mother took DES; [2] that DES caused the plaintiff's subsequent injuries; [3] that the defendant produced or marketed the type of DES taken by the plaintiff's mother; [4] and that the defendant's conduct in producing or marketing the DES constituted a breach of a legally recognized duty to the plaintiff. In the situation where the plaintiff cannot allege and prove what type of DES the mother took, as to the third element the plaintiff need only allege and prove that the defendant drug company produced or marketed the drug DES for use in preventing miscarriages during pregnancy.

*Collins,* at 193–94. The court fashioned this remedy on the grounds that as between an innocent plaintiff and the defendants, who may have provided the product and all who contributed to the risk of injury to the public, the

interests of justice and fundamental fairness demand that the latter should bear the cost of injury. *Collins,* at 191. The court further held that the defendants may implead third party defendants, and defendants have the burden of proving that they did not produce or market the subject DES, either during the time period the plaintiff was exposed to DES or in the relevant geographic market area. The plaintiff is entitled to recover all damages from the one defendant, or in the situation where there are multiple defendants, plaintiff should recover from each their proportionate share of liability under principles of comparative negligence. *Collins,* at 193–200.

In sum, the short history of DES litigation shows that the alternate liability theory is not accepted in those jurisdictions which follow the traditional rules of products liability. Those courts demand that a defendant, that is, the manufacturer or distributor of the drug, be identified as the causal agent for plaintiff's injury. Although some courts have found this theory applicable, they have done so under only two conditions: (1) where the plaintiff can show all of the defendants were before the court, or (2) where not all of the defendants were joined but strong policy reasons and the "single indivisible injury" or "risk contribution" rules could be applied.

We find persuasive the commentators and courts that have concluded that strict application of alternate liability theory does not present a viable theory for DES cases. The alternate liability theory formulation contemplates that all tortious defendants will be joined in the suit. Thus, the court can be sure that at least one of the defendants was directly responsible for the plaintiff's harm. The alternate liability formula does not, in its pure form, provide a fair way to apportion damages among the defendants. Under the alternate liability theory, defendants that produced or marketed small amounts of DES and those that produced or marketed large amounts would be equally liable.

## CONCERTED ACTION

The theory of concerted action derives from vicarious liability. The plaintiff must show a tacit agreement among defendants to perform a tortious act. Prosser, at 291–92. The Restatement requires a showing that a defendant

(a) does a tortious act in concert with the other or pursuant to a common design with him, or

(b) knows that the other's conduct constitutes a breach of duty and gives substantial assistance or encouragement to the other so to conduct himself, or

(c) gives substantial assistance to the other in accomplishing a tortious result and his own conduct, separately considered, constitutes a breach of duty to the third person.

Restatement (Second) of Torts § 876(a)–(c), at 315 (1977). The basic difference between alternate liability and concerted action is that the former involves independent acts by two or more tortfeasors, all of whom have acted wrongfully, but only one of whom has injured the plaintiff, whereas concert of action is a true joint tort in that all acted jointly to produce the harm. *Abel v. Eli Lilly & Co.,* 418 Mich. 311, 343 N.W.2d 164, 176 (1984).

The concerted action typically alleged by DES plaintiffs (and the Martins in this case) consists of the pharmaceutical manufacturers using one another's marketing techniques, manufacturing DES according to an agreed–upon formula, promoting its marketability as a generic drug, relying upon one another's testing, and encouraging one another not to perform adequate tests and not to provide adequate warnings. Note, *Market Share Liability: An Answer to the DES Causation Problem,* 94 Harv. L. Rev., at 670 n.18.

The *Abel* court accepted this theory, holding that defendants' joint breach of their duty of care to the plaintiffs resulted from their concerted action in producing and marketing an ineffective and dangerous product without adequate testing or warning. The defendants contended that there was no evidence of concerted action, but the court determined that this was a disputed question of fact,

not a test of the sufficiency of the pleadings. The court did not indicate in its opinion, however, just what would constitute sufficient proof of concerted action.

In *Bichler v. Eli Lilly & Co.,* 55 N.Y.2d 571, 436 N.E.2d 182, 450 N.Y.S.2d 776 (1982), the court allowed a limited expansion of the doctrine of concerted action to cover the type of circumstances faced in a DES case. The concerted activity claimed was essentially the same as in *Abel,* the wrongful testing and marketing of the drug for treatment of problems of pregnancy. The plaintiffs, however, specifically contended that the drug companies paralleled each other in failing to test DES properly as a result of some implied understanding. The court viewed concert of action as being analogous to a "joint control of the risk" as discussed in the case of *Hall v. E.I. Du Pont De Nemours & Co.,* 345 F. Supp. 353, 372 (E.D.N.Y. 1972). This control, the court reasoned, could be shown by evidence of explicit agreement, or by parallel behavior from which tacit agreement sufficient to sustain the concerted action theory could be inferred.

All other courts, however, have rejected, as a matter of law, DES plaintiffs' claims that the pharmaceutical manufacturers engaged in concerted action. These courts have generally rejected this theory because the plaintiff cannot show an agreement among the manufacturers to market the drug in 1947 for accidents of pregnancy. Although the court in *Ferrigno* accepted the alternate liability theory, it rejected the plaintiff's concert of action theory. The reasoning behind the rejection was the distinction made between the 1940 and 1947 applications to the FDA to market DES. The plaintiffs relied on the 1940 applications to establish concert of action, but because those applications were unrelated to DES use in pregnancy, the *Ferrigno* court refused to consider them as evidence of concerted, tortious activity. The court also emphasized the necessity of alleging that the concerted conduct itself was tortious.

Just as the California Supreme Court in *Sindell* rejected the opinion of the appellate court regarding alternate lia-

bility, it similarly refused to apply that court's interpretation of concert of action to a DES claim. The appellate court had determined that plaintiff's allegations satisfied the pleading requirements under the concert of action theory. It found that the fact that every defendant in the case may not have manufactured the particular pills taken by the mother was not determinative, since the pleadings indicated that each defendant gave substantial assistance or encouragement to the tortious conduct of the others. The appellate court also stated that the determination of whether the defendants' conduct was a substantial factor would be a jury question. The truth of the allegations or their proof was said not to be a matter of concern at that stage of the pleadings. Therefore, the appellate court concluded that identification of the actual manufacturer was also irrelevant.

The California Supreme Court's analysis, however, found that there was no concert of action among defendants within the meaning of that doctrine. The court held that the plaintiff's allegations did not amount to a charge of tacit understanding or a common plan because the parallel or imitative conduct in reliance on each other's testing and promotional methods was a common practice in the industry, and insufficient to support the allegations. The court would require the plaintiff to prove that each defendant knew the other's conduct was tortious and that the manufacturers encouraged one another to refrain from testing DES. *Sindell,* at 604–06. *Accord, Collins,* at 185–87; *Ryan,* at 1015–16; *Morton,* at 597; *Lyons v. Premo Pharmaceutical Labs, Inc.,* 170 N.J. Super. 183, 190, 406 A.2d 185, *cert. denied,* 82 N.J. 267 (1979).

We agree with those jurisdictions which have rejected the concerted action theory as a basis of liability in DES cases. Several of the opinions rejecting the concert of action theory disclose a conscientious, careful analysis of the applicable rules of law in the light of a sensitive and understanding discussion of the realities of the problems presented by the DES cases. The pleadings and supporting

affidavits do not support the theory that the defendants tacitly agreed to produce and market DES for accidents of pregnancy without adequately testing the drug or warning of its potential dangers. Although there was a substantial amount of parallel activity by the defendants, this does not rise to the level of concerted action.

### ENTERPRISE LIABILITY

The theory of enterprise or industry–wide liability is grounded on the premise that "losses to society created or caused by an enterprise or, more simply, by an activity, ought to be borne by that enterprise or activity." Klemme, *The Enterprise Liability Theory of Torts,* 47 U. Colo. L. Rev. 153, 158 (1976). Enterprise liability holds the defendants liable for sharing in industry–wide misconduct. *See, e.g., Hall v. E.I. Du Pont De Nemours & Co.,* 345 F. Supp. 353 (E.D.N.Y. 1972). In *Hall,* the plaintiffs, children who were injured by blasting caps, could not identify the manufacturers of the caps that injured them. The court held plaintiffs' claims contained issues of fact regarding whether the blasting cap manufacturers were jointly aware of the risks at issue and had a joint capacity to reduce those risks. *Hall,* at 380. At present, the theory of enterprise liability has not been accepted by any court involved in DES litigation. The courts have generally rejected this theory on the grounds that enterprise liability, as described in *Hall,* is predicated upon industry–wide cooperation of a much greater degree than occurred among DES manufacturers. *Morton,* at 598; *Ryan,* at 1017; *Namm,* at 34–35.

The *Sindell* court distinguished the *Hall* case upon which plaintiffs relied and which approved of the enterprise theory. The court found significant differences between the situations in *Hall* and *Sindell.* To begin with, there was a great disparity between the number of manufacturers in the two cases. *Hall* involved 6 manufacturers whereas there were over 200 manufacturers of DES. In addition, the *Sindell* court determined that joint control of the risk in *Hall* was based upon allegations of a trade association relation-

ship, a factual situation missing in *Sindell.* Lastly, the court held that the imposition of liability on a manufacturer under these circumstances would be unfair because of the government involvement in standards imposed on the drug industry. *Sindell,* at 609. *See also Collins v. Eli Lilly Co.,* 116 Wis. 2d 166, 342 N.W.2d 37, 47, *cert. denied,* ___ U.S. ___, 83 L. Ed. 2d 51, 105 S. Ct. 107 (1984).

The underlying rationale in all of the decisions rejecting enterprise liability is that the law of torts does not include a theory of liability which would allow an entire industry to be held strictly liable for an injury caused by a defective product. Enterprise liability as described in *Hall* is predicated upon industry–wide cooperation of a much greater degree than that alleged by the plaintiff. We agree.

## MARKET–SHARE LIABILITY

In *Sindell v. Abbott Labs.,* 26 Cal. 3d 588, 607 P.2d 924, 163 Cal. Rptr. 132, *cert. denied,* 449 U.S. 912 (1980), the Supreme Court of California modified the traditional alternate liability theory and adapted it to DES cases. Under the *Sindell* court's market–share theory, a plaintiff need only join a sufficient number of manufacturers to represent a "substantial share" of the market. Once the plaintiff has met this threshold requirement, the burden of proof shifts to each defendant to exculpate itself by showing that it could not have supplied the offending drug. Those defendants that are unable to prove their innocence are liable for the plaintiff's damages. *Sindell,* at 612. The court in *Sindell,* however, recognized that holding each of the defendants jointly and severally liable for all of plaintiff's harm would have been unfair. In view of the large number of manufacturers, the court reasoned that there "may be a substantial likelihood" that none of them supplied the drug which caused plaintiff's harm. *Sindell,* at 602–03. To overcome this difficulty, the court held that each defendant would be liable only for "the proportion of the judgment represented by its share of that market . . ." *Sindell,* at 612. Underlying the court's reasoning is the notion that,

although market–share liability might not effect a correct matching of plaintiffs and defendants in each case, each defendant ultimately will be held liable only for the amount of harm that it statistically is likely to have caused. *Sindell*, at 612–13. The *Sindell* court reasoned that the use of DES to prevent miscarriage causes harm in a certain percentage of cases. Therefore, according to the court, a defendant who produced 10 percent of the DES that was placed on the market to prevent miscarriage statistically would be likely to have caused 10 percent of the harm. Thus, if the court apportioned damages according to each defendant's market share, then theoretically each defendant would be held liable only for approximately as much harm as it caused.

The only jurisdiction outside of California recognizing the "market–share" theory is South Dakota. *See McElhaney v. Eli Lilly & Co.,* 564 F. Supp. 265 (D.S.D. 1983). The courts in New Jersey (*Namm*), Massachusetts (*Payton v. Abbott Labs,* 386 Mass. 540, 437 N.E.2d 171 (1982)), and Michigan (*Abel*) indicate the possibility that on an adequate record they might recognize some relaxation of the traditional identification requirement in appropriate circumstances so as to allow recovery against a defendant of that portion of a plaintiff's damages which is represented by that defendant's contribution of DES to the relevant market.

Although the *Sindell* market–share theory is conceptually attractive, we find it also an inappropriate theory due to its inherent distortion of liability. Although the court in *Sindell* was unclear on this point, the decision arguably requires that defendants pay 100 percent of the plaintiff's damages even though these defendants may represent less than 100 percent of the market. The inherent distortion of defendants' actual liability under the market–share liability theory is best illustrated by a hypothetical. Assume that plaintiff's damages are $100,000, and she joins enough DES manufacturers to represent 60 percent of the relevant market. Defendant X occupies 20 percent of the relevant market and one–third of the market that all joined defendants

represent. If defendant X is liable only for its share of the relevant market, it would be liable for 20 percent of the damages, or $20,000. If defendants are required to pay 100 percent of the judgment, however, then defendant X must pay one–third of the judgment, or $33,333, which is equivalent to one–third of the market that all the joined defendants represent. In other words, defendant X would have to pay 67 percent ($13,333) more than its share of the relevant market. *See* Fischer, *Products Liability—An Analysis of Market Share Liability,* 34 Vand. L. Rev. 1623, 1646 (1981). It is evident that the definition of "substantial market share" directly affects the degree to which the defendant's liability is distorted. The lower the percentage of the market that is required to be joined, the higher will be the resulting distortion.

We reject the *Sindell* market–share theory of liability. Not only does the *Sindell* court fail to define "substantial" share of the relevant market, the theory distorts market liability by providing that the "substantial" market share bears joint responsibility for 100 percent of plaintiff's injuries.

### MARKET–SHARE ALTERNATE LIABILITY

Having rejected the application of the four theories which to this date have been proposed in the DES context, this court is faced with a choice of either fashioning a method of recovery for the DES case which will deviate from traditional notions of tort law, or permitting possibly tortious defendants to escape liability to an innocent, injured plaintiff.

As noted earlier, the crux of the problem facing this DES plaintiff is that she cannot identify the drug company that she alleges caused her injury. Numerous commentators and courts have identified several reasons for this plight. First, DES was, for the most part, produced in a "generic" form which did not contain any clearly identifiable shape, color, or markings. DES was a fungible drug produced with a chemically identical formula, and often pharmacists would

fill DES prescriptions from whatever stock they had on hand, whether or not a particular brand was specified in the prescription. Second, it has been estimated that possibly as many as 300 drug companies produced or marketed DES during the 24 years DES was on the market, with companies entering and leaving the market throughout this period. Third, it appears that many drug companies may not have kept, or may not be able to locate, pertinent records as to when, where, and what type of DES they produced or marketed. These problems result from the passage of many years between the plaintiff's in utero exposure and the manifestation of cancer. During the intervening years, memories may have faded, medical and pharmaceutical records may have been lost or destroyed, and witnesses may have died.

We are presented with a conflict between the familiar principle that a tortfeasor may be held liable only for damage that it has caused, and the sense of justice which urges that the victims of this tragedy should not be denied compensation because of the impossibility of identifying the individual manufacturer of these generic tablets if their manufacture and distribution were otherwise culpable.

We believe that a modification of the alternate liability theory somewhat along the lines of the *Sindell* market–share approach is warranted. Support for such a modification is found in comment *h,* Restatement (Second) of Torts § 433B(3), at 446 (1964):

> The cases thus far decided in which the rule stated in Subsection (3) has been applied all have been cases in which all of the actors involved have been joined as defendants. All of these cases have involved conduct simultaneous in time, or substantially so, and all of them have involved conduct of substantially the same character, creating substantially the same risk of harm, on the part of each actor. It is possible that cases may arise in which some modification of the rule stated may be necessary because of complications arising from the fact that one of the actors involved is not or cannot be joined as a defendant, or because of the effect of lapse of time, or

because of substantial differences in the character of the conduct of the actors or the risks which they have created. Since such cases have not arisen, and the situations which might arise are difficult to forecast, no attempt is made to deal with such problems in this Section. The rule stated in Subsection (3) is not intended to preclude possible modification if such situations call for it.

Because certain manufacturers and distributors produced or marketed an allegedly defective drug for accidents of pregnancy, those manufacturers and distributors all contributed to the risk of injury, even though they may not have contributed to the actual injury of a given plaintiff. Although the defendants in this case have not acted in concert under the concert of action theory, all participated in either gaining approval of DES for use in pregnancy or in producing or marketing DES in subsequent years. Each defendant contributed to the *risk* of injury to the public and, consequently, the risk of injury to individual plaintiffs. Thus, each defendant shares in some measure a degree of culpability in producing or marketing DES. Moreover, as between the injured plaintiff and the possibly responsible drug company, the drug company is in a better position to absorb the cost of the injury. The drug company can either insure itself against liability, absorb the damage award, or pass the cost along to the consuming public as a cost of doing business. We conclude that it is better to have drug companies or consumers share the cost of the injury than to place the burden solely on the innocent plaintiff.

We hold that plaintiff need commence suit against only one defendant and allege the following elements: that the plaintiff's mother took DES; that DES caused the plaintiff's subsequent injuries; that the defendant produced or marketed the type of DES taken by the plaintiff's mother; and that the defendant's conduct in producing or marketing the DES constituted a breach of a legally recognized duty to the plaintiff. At the trial, the plaintiff will have to prove each of these elements to the satisfaction of the trier of fact. We emphasize, however, that the plaintiff need not

prove that a defendant produced or marketed the precise DES taken by the plaintiff's mother. Rather, the plaintiff need only establish by a preponderance of the evidence that a defendant produced or marketed the *type* (*e.g.,* dosage, color, shape, markings, size, or other identifiable characteristics) of DES taken by the plaintiff's mother; the plaintiff need not allege or prove any facts related to the time or geographic distribution of the subject DES. While the type of DES ingested by the mother should be within the domain of her knowledge, facts relating to time and distribution should be particularly within the domain of knowledge of the DES manufacturers and distributors.

We reject the *Sindell* requirement of joinder of a "substantial share" of the market because it does not alter the probability under our market–share alternate liability theory that a particular defendant caused the injury. As will be demonstrated, a particular defendant's potential liability is proportional to the probability that it caused plaintiff's injury.

Individual defendants are entitled to exculpate themselves from liability by establishing, by a preponderance of the evidence, that they did not produce or market the particular type DES taken by the plaintiff's mother; that they did not market the DES in the geographic market area of plaintiff mother's obtaining the drug; or that they did not distribute DES in the time period of plaintiff mother's ingestion of the drug.

The defendants that are unable to exculpate themselves from potential liability are designated members of the plaintiffs' DES market, defined by the specificity of the evidence as to geographic market area, time of ingestion, and type of DES. These defendants are initially presumed to have equal shares of the market and are liable for only the percentage of plaintiff's judgment that represents their presumptive share of the market. These defendants are entitled to rebut this presumption and thereby reduce their potential liability by establishing their respective market share of DES in the plaintiff's particular geographic mar-

ket. Upon proof of a market share by a preponderance of the evidence, that particular defendant is only liable for its share of the market as it relates to the total judgment. To the extent that other defendants fail to establish their actual market share, their presumed market share is adjusted so that 100 percent of the market is accounted for.

Application of this rule of apportionment is illustrated by the following hypotheticals. Assume that plaintiff's damages are $100,000 and defendants X and Y remain subject to liability after exculpation by other named defendants. If neither establishes its market share then they are presumed to have equal shares of the market and are liable respectively for 50 percent of the total judgment, X, $50,000 and Y, $50,000.

Assume defendant X establishes that it occupies 20 percent of the relevant market, and defendant Y fails to prove its market share. Defendant X is then liable for 20 percent of the damages, or $20,000, and defendant Y is subject to the remaining 80 percent, or $80,000.

Assume that defendant X establishes a market share of 20 percent and defendant Y a 60 percent market share. Then defendant X is subject to 20 percent of the judgment, $20,000, and defendant Y to 60 percent of the judgment, $60,000. The plaintiff does not recover her entire judgment because the remaining 20 percent of the market share is the responsibility of unnamed defendants.

The defendants may implead third party defendants in order to reduce their presumptive share of the market or in order to establish an actual reduced market share.

This ability of a defendant to reduce its liability reduces the disproportion between potential liability that a particular defendant caused the injury by imposing liability according to respective market shares. In the case where each party carries its burden of proof, no defendant will be held liable for more harm than it statistically could have caused in the respective market.

We recognize that the elimination of individual causal responsibility as an element of plaintiff's case is liability

enhancing. However, it is also liability limiting insofar as it permits the defendants to apportion liability according to respective market share and further provides that the plaintiff may not be able to recover her entire damages. Under this market share alternate liability theory, the dilution of causal blame that is attributable to a given defendant may be counterbalanced by the corresponding dilution of liability.

### STANLEY DRUG PRODUCTS, INC. AND KIRKMAN LABORATORIES, INC.

We agree with the trial court that defendants Stanley Drug Products, Inc., and Kirkman Laboratories, Inc., were not entitled to summary judgment. The Martins established that they produced or marketed the type of DES taken and the defendants failed to exculpate themselves. However, we do not believe that these defendants are necessarily liable for all the damages plaintiff may be awarded in the event liability is imposed. These defendants are subject to potential liability in accordance with the rules heretofore enunciated.

### E. R. SQUIBB AND SONS, INC. AND RAWAY PHARMACEUTICAL COMPANY

The Martins contend that E. R. Squibb and Sons, Inc., and Raway Pharmaceutical Company were not entitled to summary judgment because issues of material fact existed as to whether they supplied the type of DES taken. As to Raway, Martins contend that, because Raway was listed in the drug catalogs as a distributor of DES, there existed a material issue of fact as to whether Raway supplied DES to Ludwig's pharmacy, despite the affidavits of the director of Raway that they never manufactured or distributed DES. Concerning Squibb, the Martins contend a material issue of fact existed as to whether Ludwig's pharmacy sold DES at a price lower than the wholesale price of Squibb's product, despite the fact that Mr. Ludwig indicated that the phar-

macy never used Squibb's products.

We are in agreement with the Martins that issues of material fact exist as to whether Raway Pharmaceutical Company could have supplied the DES to Ludwig's pharmacy which ultimately reached the appellants. The Martins introduced the industry source books, the Drug Topics— Red Book and American Druggist Blue Book, which identified Raway as selling 100 mg. tablets of DES, the dosage prescribed for Shirley Martin, during the time period of its ingestion. In support of Raway's motion for summary judgment, the "director" of Raway stated, by way of affidavit, that at no time did Raway Pharmaceutical Company manufacture, distribute, design, produce, or in any way assist in any of the foregoing functions concerning the drug diethylstilbestrol.

Considering the facts in a light most favorable to the nonmoving party, a genuine issue of material fact is presented regarding possible manufacture and/or distribution of DES which ultimately reached the Martins. The truth of the director's averments and his credibility are directly at issue where the industry source books conflict with his statements.

The grant of summary judgment in favor of E. R. Squibb and Sons, Inc., was proper. The averments of Squibb and pharmacist Ludwig are not susceptible to an interpretation other than that Squibb could not have supplied the DES ingested by Shirley Martin. Mr. Ludwig's testimony established that Ludwig's pharmacy never purchased or sold Squibb's trademarked DES ("Stilbetin") and that he was sufficiently familiar with his stock of drugs to state that he did not dispense DES from Squibb to Mrs. Martin. Further, Mr. Ludwig could not have dispensed Squibb's trademarked DES to Mrs. Martin because the *retail* price paid by Mrs. Martin ($2.25) for 20 100 mg. tablets, was less than the *wholesale* price for Squibb's trademarked product ($3.20) and Mr. Ludwig did not sell drug products for less than what he had paid for them.

## Successor Liability—Stanlabs Pharmaceutical Company

The Martins contend that the trial court erred in granting summary judgment in favor of Stanlabs Pharmaceutical Company for acts of Stanley Drug Products, Inc.

Traditionally, a corporation purchasing the assets of another corporation does not, by reason of the purchase of assets, become liable for the debts and liabilities of the selling corporation. The courts have recognized, however, that the traditional rule allows a transferring corporation, under certain circumstances, to effectively avoid its obligations to the detriment of *creditors* and minority *shareholders*. Thus, Washington has recognized four narrow exceptions to the traditional rule: (1) the purchaser expressly or impliedly agrees to assume liability; (2) the purchase is a de facto merger or consolidation; (3) the purchaser is a mere continuation of the seller; or (4) the transfer of assets is for the fraudulent purpose of escaping liability. *Meisel v. M & N Modern Hydraulic Press Co.,* 97 Wn.2d 403, 405, 645 P.2d 689 (1982); *Cashar v. Redford,* 28 Wn. App. 394, 396, 624 P.2d 194 (1981); Casenote, *Successor Liability in Washington: When a Successor Should Be Liable for a Predecessor's Products Liability—Meisel v. M & N Modern Hydraulic Press Company,* 6 U. Puget Sound L. Rev. 323 (1983) (hereinafter Casenote, *Successor Liability in Washington*). In any of these four circumstances, the court will find that the acquiring entity is a successor to the liabilities and obligations of the selling corporation.

Recently, however, courts have come to recognize that the traditional rule of nonliability, with its four exceptions, was developed solely on corporate law principles to protect the rights of commercial creditors and dissenting shareholders following corporate acquisitions. These traditional rules of successor liability fail to address the particular circumstances of a products liability claimant. *Turner v. Bituminous Cas. Co.,* 397 Mich. 406, 244 N.W.2d 873 (1976); *Ramirez v. Amsted Indus., Inc.,* 86 N.J. 332, 431 A.2d 811 (1981); *Dawejko v. Jorgensen Steel Co.,* 290 Pa.

Super. 15, 434 A.2d 106 (1981); *Ray v. Alad Corp.*, 19 Cal. 3d 22, 560 P.2d 3, 136 Cal. Rptr. 574 (1977).

Although the common law exceptions protect commercial creditors, they frequently leave the products liability plaintiff without a remedy. Since an acquiring corporation will generally purchase the transferor's assets for consideration adequate to avoid those known liabilities that the traditional rule seeks to protect (i.e., traditional debts and obligations), the traditional rule looks to the transferor as the source of recovery. If, however, the transferor has dissolved, and if more than two years have elapsed from the time of dissolution, the injured plaintiff is left without a remedy. Thus, while the traditional rules of corporate law satisfy the needs of traditional creditors whose claims arise before or soon after the predecessor's dissolution, those rules provide no adequate remedy for the typical products liability plaintiff whose claims frequently arise years after the product's purchase.

The failure of the traditional rules of successor liability to meet the needs of the products liability plaintiff results from the rule's limited purpose. The rule's purpose is to protect persons having obligations against a business entity. Although a products liability plaintiff falls into that class of person, the traditional rule was fashioned to meet the needs of only those claimants whose claims were clearly identifiable at the time of the transfer. Fashioned long before the advent of the modern products liability doctrine, the traditional rule did not anticipate the social policies underlying the new doctrine. Consequently, the application of the traditional rule frustrates the policies of modern products liability.

(Footnotes omitted.) Casenote, *Successor Liability in Washington,* at 332–33. *See also* Note, *Postdissolution Product Claims and the Emerging Rule of Successor Liability,* 64 Va. L. Rev. 861 (1978).

In an effort to make the traditional corporate approach more responsive to products liability law, several courts have broadened the "mere continuation" exception in order to expand corporate successor liability in certain situations. *See Turner,* at 422–31; *Cyr v. B. Offen & Co.,* 501 F.2d 1145, 1152–54 (1st Cir. 1974).

The "mere continuation" exception was first expanded

by a federal court applying New Hampshire law in *Cyr v. B. Offen & Co.,* 501 F.2d at 1152–54. In *Cyr,* two printing press employees were seriously injured in 1969 by the drying ovens of a machine manufactured in 1959 by B. Offen & Company, a sole proprietorship. In 1963, a group of employees of the original manufacturer had formed the defendant corporation, B. Offen & Company, Inc., and had purchased for cash the drying system of the presses from the executor of the estate of the sole proprietor. The contract of sale between the successor corporation and the predecessor's estate provided for the purchase of the predecessor's goodwill, contract and service obligations, and the continued operation of the predecessor's business without substantial change. The contract expressly disclaimed successor corporation liability for costs incurred by the torts of the predecessor. The court held that there was sufficient justification for a jury to treat the successor corporation as the mere continuation of its predecessor for the purposes of imposing tort liability for injuries caused by defective products. It found that the successor corporation continued to produce the same product, through the same employees, in the same physical plant, and under the same supervision as its predecessor, and that by use of essentially the same name held itself out to the world as the same enterprise.

The *Cyr* court justified its holding on the public policy considerations underlying strict products liability. It recognized that the successor corporation, not being the original manufacturer, is not the specific legal entity that placed the defective product in the stream of commerce or made implied representations as to its safety. Nonetheless, there were several other policy justifications for imposing strict products liability on the successor. The first was, in essence, the risk–spreading approach:

> The very existence of strict liability for manufacturers implies a basic judgment that the hazards of predicting and insuring for risk from defective products are better borne by the manufacturer than by the consumer. The manufacturer's successor, carrying over the experience

and expertise of the manufacturer, is likewise in a better position than the consumer to gauge the risks and the costs of meeting them. The successor knows the product, is as able to calculate the risk of defects as the predecessor, is in position to insure therefor and reflect such cost in sale negotiations, and is the only entity capable of improving the quality of the product.

*Cyr,* at 1154. The court also reasoned that the successor corporation, having reaped the benefits of continuing its predecessor's product line, exploiting its accumulated goodwill and enjoying the patronage of its established customers, should be made to bear some of the burdens of continuity, namely, liability for injuries caused by its defective products.

Perhaps the most significant decision expanding the "mere continuation" exception to the traditional rule of corporate successor nonliability is *Turner v. Bituminous Cas. Co.,* 397 Mich. 406, 244 N.W.2d 873 (1976). The *Turner* court held that in applying the mere continuation exception to situations involving the sale of corporate assets for cash, continuity of shareholders between selling and purchasing corporations is not a relevant criterion for the purposes of determining successor liability for injury caused by defective products. Rather, it adopted a less stringent version of the mere continuation exception in the sale–of–assets–for–cash context, emphasizing continuity of the enterprise of the predecessor corporation. This continuity included: retention of key personnel, assets, general business, and trade name. Other indicia of continuation included the fact that the seller corporation ceased ordinary business operations, the purchasing corporation assumed those liabilities and obligations of the seller necessary for the continuation of the business, and the purchasing corporation held itself out as the effective continuation of the seller corporation.

The courts of Wisconsin and Alabama have chosen to follow the *Turner* "mere continuation" approach to product liability. *See Tift v. Forage King Indus., Inc.,* 108 Wis. 2d

72, 322 N.W.2d 14 (1982); *Andrews v. John E. Smith's Sons Co.,* 369 So. 2d 781 (Ala. 1979).

Rather than expand a rule designed for other purposes, the California Supreme Court developed an exception for successor liability specifically designed to deal with products liability claims. *Ray v. Alad Corp.,* 19 Cal. 3d 22, 560 P.2d 3, 136 Cal. Rptr. 574 (1977).

In *Ray,* the manufacturer of a defective ladder had sold its assets for cash and dissolved prior to the products liability claim. A new and separately owned corporation acquired the plant, equipment, inventory, trade name, personnel, customer lists, and goodwill of the manufacturer, and continued the same line of business under the same corporate name. There was no intervening manufacturing hiatus during or after the sales transaction. The court recognized that if it applied the traditional successor liability rules, the victim would be without a remedy because the predecessor had received adequate consideration for its assets, distributed the consideration to its shareholders, and dissolved before the plaintiff's claim arose. The court determined that none of the four stated exceptions to the general rule of nonliability under the traditional corporate law approach was a sufficient basis for imposing liability on the purchasing corporation. Nevertheless, the court determined that a departure from that traditional approach was called for by the policies underlying strict tort liability for injuries caused by defective products. Rather than adopt the expanded "mere continuation" exception to the corporate law approach as developed in *Cyr* and *Turner,* the *Ray* court abandoned the traditional analysis. It developed instead the following formulation, which has since come to be known as the "product line" approach to successor corporation liability for injuries caused by defective products:

> We . . . conclude that a party which acquires a manufacturing business and continues the output of its line of products under the circumstances here presented assumes strict tort liability for defects in units of the

same product line previously manufactured and distributed by the entity from which the business was acquired.

*Ray,* at 34.

The *Ray* court formulated this successor liability test based on the underlying strict products liability policies of compensation of injured victims and the allocation of product defect causing injury costs throughout society.

> [C]onsiderations favoring continued protection for injured users of defective products. . . . include (1) the nonavailability to plaintiff of any adequate remedy against [the transferor] as a result of [their] liquidation prior to plaintiff's injury, (2) the availability to [the transferee] of the knowledge necessary for gauging the risks of injury from previously manufactured [units] together with the opportunity to provide for meeting the cost arising from those risks by spreading it among current purchasers of the product line and (3) the fact that the good will transferred to and enjoyed by [the transferee] could not have been enjoyed by [the transferor] without the burden of liability for defects in [units] sold under its aegis.

*Ray,* at 25.

The court's duty under the *Ray* rule is (1) to determine whether the transferee has acquired substantially all the transferor's assets, leaving no more than a mere corporate shell; (2) to determine whether the transferee is holding itself out to the general public as a continuation of the transferor by producing the same product line under a similar name; and (3) to determine whether the transferee is benefiting from the goodwill of the transferor.

In *Meisel v. M & N Modern Hydraulic Press Co.,* 97 Wn.2d 403, 405, 645 P.2d 689 (1982), this court had occasion to apply the *Ray* rule to a summary judgment proceeding. Although we held that we need not adopt the *Ray* rule under the factual circumstances of that case, we did note that the *Ray* criteria were salutary and not inconsistent with Washington products liability policy. *Meisel,* at 408 n.1. Applying the *Ray* criteria to the summary judgment proceedings, we stated:

With respect to *Ray*'s first justification, we may assume for summary judgment purposes that Meisel has no other remedy than that against Modern. With respect to *Ray*'s second justification, Modern's ability to assume M & N's risk–spreading role is certainly a factual question since it is in the same business and can anticipate like risks. And as to the third justification, "fairness", the similarity of M & N's and Modern's name and product (Modern manufactures a custom line while M & N manufactured a standard line), and Modern's purported assumption of M & N's goodwill (the Los Angeles machinery broker thought the company had only undergone a name change) present factual questions.

*Meisel,* at 407. This court concluded, however, that while all the factual issues were incompatible with summary judgment, successor liability was inapplicable because there had been no transfer of assets.

 We now find it appropriate to adopt the *Ray* "product–line" criteria for successor liability in products liability actions. In doing so, we are in accord with the courts of New Jersey and Pennsylvania. *See Ramirez v. Amsted Indus., Inc.,* 86 N.J. 332, 431 A.2d 811 (1981); *Dawejko v. Jorgensen Steel Co.,* 290 Pa. Super. 15, 434 A.2d 106 (1981). The court in *Dawejko* noted the reasons for adopting the product–line exception as opposed to expansion of the traditional corporate acquisition exceptions:

It is perhaps only a matter of style how one proceeds. One may retain the traditional exceptions but expand their boundaries, so that "merger" or "continuation" are held to include cases they once would not have included. Or one may adopt a new exception, such as the product–line exception. We believe it better to adopt a new exception. To the extent the law has changed—and so far, as the foregoing discussions indicates, it has changed in relatively few jurisdictions—the change may be explained as an attempt to implement "the social policies underlying strict products liability." *Ramirez v. Amsted Industries, Inc.* [86 N.J. 332] at 358, 431 A.2d at 825. By adopting a new exception, this impetus is acknowledged and made plain, the other exceptions then remaining, to

deal with cases not so much affected by the policy considerations that have led to the rule of strict liability for defective products.

*Dawejko,* at 25–26.

While both the product–line exception and the expanded mere continuation exception are founded on the same principles, we find it appropriate to retain the traditional corporate exceptions for their intended purposes and adopt the product–line exception specifically formulated for products liability claims.

This narrowly drawn rule strikes a fair balance among the competing considerations of products liability and corporate acquisitions. Imposition of liability is properly based on the successor's receipt of a benefit from the predecessor's product line. The benefit of being able to take over a going concern manufacturing a specific product line is necessarily burdened with potential products liability linked to the product line. This standard allows the parties to a transfer to consider potential products liability and in fairness to the competing considerations still leaves some claimants uncompensated and some forms of transfer immune.

In the case at bar, the same factors discussed by this court in *Meisel* preclude the grant of summary judgment to Stanlabs Pharmaceutical Company. All reasonable inferences must be resolved against the movant and considered in the light most favorable to the nonmoving party. Specifically, this court must assume, for summary judgment purposes, that the Martins have no other remedy than that against Stanlabs Pharmaceutical Company. The affidavits, depositions, and admissions show that Stanlabs Pharmaceutical Company purchased substantially all of the assets of Stanley Drug Products, Inc., including all going concern value, customers lists, and the name Stanley Drug Products, Inc. Further, issues of fact remain concerning Stanlabs Pharmaceutical Company's continuation of Stanley Drug Products, Inc.'s tabletizing and distribution of DES, the similarity of Stanlabs Pharmaceutical Company's and

Stanley Drug Products, Inc.'s names and product lines, the use by Stanlabs Pharmaceutical Company of containers bearing Stanley Drug Products, Inc.'s name after Stanlabs Pharmaceutical Company succeeded to its assets, and Stanlabs Pharmaceutical Company's assumption of Stanley Drug Products, Inc.'s goodwill.

Here, only Stanlabs Pharmaceutical Company moved for summary judgment. Given the trial court's apparent application of an incorrect legal standard—one that does not take into account our adoption of the *Ray* criteria—and given the facts recited above which arguably support a finding of successor liability, we hold that the trial court erred in granting Stanlabs Pharmaceutical Company's motion for summary judgment.

We affirm the trial court's grants of summary judgment as to the remaining defendants finding no material issues of fact concerning their exculpation from liability.[3]

CONCLUSION

Having found that the Martins stated a cause of action as heretofore enunciated, we affirm the denial of summary judgment to Stanley Drug Products, Inc., and Kirkman Laboratories, Inc. We reverse the grant of summary judgment in favor of Raway Pharmaceutical Company and Stanlabs Pharmaceutical Company. All remaining grants of summary judgment are affirmed.

We remand to the trial court to proceed in accordance with the provisions of this opinion.

WILLIAMS, C.J., ROSELLINI, BRACHTENBACH, and DOLLIVER, JJ., and CUNNINGHAM, J. Pro Tem., concur.

---

[3]It should be noted that those defendants who were not dismissed, Kirkman Laboratories, Inc., Stanlabs Pharmaceutical Company, and Ludwig's pharmacy, have all filed briefs asking this court to consider questions of substantive law relating to their possible liability. This court has held that a denial of a summary judgment is not a final and appealable order. *Glass v. Stahl Specialty Co.*, 97 Wn.2d 880, 883, 652 P.2d 948 (1982). Thus, the claims by these parties are not appropriately before this court as part of this appeal. We decline to address these additional issues of substantive liability.

PEARSON, J. (concurring in part, dissenting in part)—I concur with the majority except with respect to the imposition of strict liability on Stanlabs Pharmaceutical Company because of its status as successor corporation to Stanley Drug Products, Inc. It is my belief that the traditional rule of nonliability for successor corporations should not be abandoned in favor of the product line rule of *Ray v. Alad Corp.*, 19 Cal. 3d 22, 560 P.2d 3, 136 Cal. Rptr. 574 (1977). I realize that the majority's adoption of the *Ray* rule is consistent with dicta appearing in *Meisel v. M & N Modern Hydraulic Press Co.*, 97 Wn.2d 403, 645 P.2d 689 (1982). In *Meisel* we noted, in a unanimous opinion, that the *Ray* rule "may well be salutary, and it would not be inconsistent with this court's prior holdings to adopt it." *Meisel*, at 408 n.1. However, upon further reflection, I am now convinced that the *Ray* product line rule is inconsistent with several major policy considerations underlying the imposition of strict liability. These policy considerations are ignored by the majority.

I

Initially, I note that in the 7 years since *Ray* was decided only two other jurisdictions have adopted the product line rule. *See Ramirez v. Amsted Indus., Inc.*, 86 N.J. 332, 431 A.2d 811 (1981); *Dawejko v. Jorgensen Steel Co.*, 290 Pa. Super. 15, 434 A.2d 106 (1981). The majority of jurisdictions which have addressed the question of whether to impose strict liability on a successor corporation have expressly rejected the *Ray* approach. *See Rhynes v. Branick Mfg. Corp.*, 629 F.2d 409 (5th Cir. 1980) (applying Texas law); *Travis v. Harris Corp.*, 565 F.2d 443 (7th Cir. 1977) (applying Ohio and Indiana law); *Leannais v. Cincinnati, Inc.*, 565 F.2d 437 (7th Cir. 1977) (applying Wisconsin law); *Jones v. Johnson Mach. & Press Co.*, 211 Neb. 724, 320 N.W.2d 481 (1982); *Bernard v. Kee Mfg. Co.*, 409 So. 2d 1047 (Fla. 1982); *Stratton v. Garvey Int'l, Inc.*, 9 Kan. App. 2d 254, 676 P.2d 1290 (1984); *Manh Hung Nguyen v. Johnson Mach. & Press Corp.*, 104 Ill. App. 3d

1141, 433 N.E.2d 1104 (1982). These courts chose to apply the traditional corporate law rule which does not impose the liabilities of the selling predecessor upon the buying successor company unless (1) the successor expressly or impliedly assumes the obligations of the predecessor, (2) the transaction is a de facto merger, (3) the successor is a mere continuation of the predecessor, or (4) the transaction is a fraudulent effort to avoid liabilities of the predecessor. This approach is, I think, preferable to that taken by the *Ray* court and by the majority in this case.

## II

The *Ray* product line exception to the general rule of nonliability states:

> [A] party which acquires a manufacturing business and continues the output of its line of products . . . assumes strict tort liability for defects in units of the same product line previously manufactured and distributed by the entity from which the business was acquired.

*Ray v. Alad Corp.,* 19 Cal. 3d at 34. For the reasons stated below, I do not believe that the *Ray* holding is consistent with the philosophy and purpose behind the law of strict liability.

In *Bombardi v. Pochel's Appliance & TV Co.,* 9 Wn. App. 797, 515 P.2d 540 (1973), the court correctly observed that:

> the purpose of [strict] liability is to ensure that the costs of injuries resulting from defective products are borne *by the makers of the products who put them in the channels of trade,* in this case Admiral Corporation, rather than by the injured persons who ordinarily are powerless to protect themselves.

(Italics mine.) *Bombardi,* at 806. In order to effectuate this purpose, strict liability is extended to *those within the chain of distribution. Seattle–First Nat'l Bank v. Tabert,* 86 Wn.2d 145, 148, 542 P.2d 774 (1975). It is precisely those within the chain of distribution that have participated in the creation of the risk by producing or marketing the defective product. "The cornerstone of strict liability rests

upon the defendant's active participation in placing the allegedly defective product into commerce . . .". *Domine v. Fulton Iron Works,* 76 Ill. App. 3d 253, 257, 395 N.E.2d 19 (1979) (rejecting the *Ray* product line exception).

It is readily apparent that the purpose of strict liability, as stated in *Bombardi,* is in no way furthered by holding a successor corporation liable for defects in its predecessor's products merely because the successor manufactures the same type of product as did the predecessor. The successor is outside the original producing and marketing chain. The successor did not make the product, nor did it place the product into the channels of trade. In short, the successor had nothing to do with the creation of the risk presented by the defective product. Moreover, since the successor was never in a position to eliminate the risk, a major purpose of strict liability in modifying the manufacturer's behavior is also lost.

Another major justification for strict liability is that "the seller, by marketing his product for use and consumption, has undertaken and assumed a special responsibility toward any member of the consuming public who may be injured by it . . .". Restatement (Second) of Torts § 402A, comment *c,* at 349 (1965). When this court adopted the strict liability rule of section 402A in *Ulmer v. Ford Motor Co.,* 75 Wn.2d 522, 452 P.2d 729 (1969), it noted that strict liability was based on a sort of implied warranty which was not subject to various contract rules such as privity. *Ulmer,* at 529–32. The *Ulmer* court concluded that "[s]ection 402A . . . is in accord with the import of our cases which have been decided upon a theory of breach of implied warranty and we hereby adopt it as the law of this jurisdiction." *Ulmer,* at 531–32.

This implied warranty rationale does not, however, apply to a corporate successor to the manufacturer of a defective product. The successor has neither invited the use of the product nor represented to the public that the product was safe and suitable for use.

The majority, by adopting the *Ray* product line excep-

tion, ignores the major policy considerations underlying strict liability discussed above. While it is no doubt true that the traditional corporate law rule of nonliability of successors was not formulated with the particular circumstances of a products liability claimant in mind, that rule and its exceptions are nevertheless quite consistent with the justifications for strict liability discussed above. The traditional rule and its exceptions ensure (1) that strict liability is not imposed where the successor had nothing to do with creating the risk presented by a defective product, and (2) that strict liability is imposed where the successor is, in effect, the same entity as the predecessor who produced or marketed the defective product. Thus, liability is placed upon those who are responsible for placing defective products in the flow of commerce and inviting the public to use those products. Such a result is entirely consistent with the philosophy behind strict liability.

## III

I turn now to examine the points of justification offered in support of the *Ray* rule.

The first justification offered by the courts which have adopted *Ray* is that the plaintiff has lost his remedy against the dissolved predecessor and can only sue the successor; there is no one else to look to. It seems to me, however, that this is merely a statement of the problem rather than a justification for any particular solution to the problem. Moreover, RCW 7.72.040(2)(a) and (b) allow a plaintiff to bring an action against the seller of an allegedly defective product if the manufacturer is unavailable. Thus, a products liability plaintiff is rarely left without a remedy.

The second justification offered in support of the *Ray* approach is that the successor corporation is better able to gauge the risks of liability, insure against those risks, and spread the cost among the consuming public, than is the injured plaintiff. Simply stated, the successor should be liable because it can afford it.

I fear that this rationale is illusory. I question whether

the successor may, realistically, be able to obtain open-ended products liability insurance to cover accidents resulting from defects in the predecessor's product. Recent studies indicate that many manufacturers, especially smaller companies, have great difficulty obtaining products liability insurance even for their *own* products, and find it impossible to cover the cost by raising prices because they have to compete with larger manufacturers who can keep the price down. Schwartz, *The Federal Government and the Product Liability Problem: From Task–Force Investigation to Decisions by the Administration,* 47 U. Cin. L. Rev. 573 (1978); Schiff, *Products Liability and Successor Corporations: Protecting the Product User and the Small Manufacturer Through Increased Availability of Products Liability Insurance,* 13 U.C.D. L. Rev. 1000 (1980). As one commentator concluded:

> Most small corporations are unable to secure policies covering liability for injuries caused by the predecessor's products. When such insurance is available, the cost is often prohibitive.

Schiff, 13 U.C.D. L. Rev. at 1003. A primary reason that the cost of such insurance is prohibitive is that small manufacturers are often unable to pass that cost on to the consuming public through increased prices.

> [T]heir ability to pass on the costs are limited. They are limited by the pricing performance of their major competitors. Generally what happens, and there are some exceptions, particularly various specialty–type products, is that the major corporations . . . will set the parameters of the price. The small firm cannot leave those parameters without coming into some serious problems.

Select Committee on Small Business, *Impact of Product Liability on Small Business,* S. Rep. No. 629, 95th Cong., 2d Sess. 167, 168–69 (1978). As I see it, the inability of small corporations to obtain insurance for successor liability, coupled with the inability of those corporations to spread the cost of such insurance if they can obtain it, undermines the rationale and legitimacy of the second

justification offered in support of the *Ray* product line approach.

The final justification offered for the *Ray* rule is that, because the successor enjoys the goodwill of the predecessor, the successor should bear the corresponding burden of liability for the predecessor's products which created that goodwill. The problem with this benefit/burden rationale is that the benefit, in terms of goodwill stemming from an established trade name or product, has been considered and negotiated during the acquisition of the predecessor corporation. The successor, then, has already paid once for its predecessor's goodwill. To require the successor to assume liability for its predecessor's defective products on the basis of acquired goodwill would be, in effect, requiring the successor to pay twice for that goodwill. This hardly seems equitable, especially when one considers that it is the predecessor, and not the successor, which has benefited most directly from this intangible goodwill. The predecessor has received the profits from the sale of the product which created the goodwill, in addition to receiving the profit from the sale as an asset of the goodwill itself. It is true that the successor does benefit in a remote way from the goodwill purchased from the predecessor. However, the revelation of past production failures injures that goodwill and deprives the successor of the benefit it has purchased. Thus, the successor has lost the benefit of its bargain. Imposing strict liability upon a successor corporation because that corporation is supposedly enjoying the benefits of its predecessor's goodwill is illogical where those benefits no longer remain. Yet that is what the majority does by adopting the product line exception to the general rule of successor nonliability.

There are other troublesome aspects to the concept of goodwill as a benefit justifying strict successor liability. How is goodwill to be measured, and how much is needed to justify liability? Some companies are sold because they have a bad reputation, and the successor believes it can reverse the public's attitude toward the product. Would an absence of goodwill preclude successor liability? Finally,

even if it were fair to impose liability on a successor corporation because it benefits from its predecessor's goodwill, and even if that goodwill could be evaluated, then should not the successor's liability be limited to the value of the goodwill from which it supposedly benefits?

In sum, I find no justification for such a basic departure from traditional concepts of corporate and tort law as that taken by the majority. The justifications offered by the handful of courts which have adopted the product line rule are not persuasive. The public policy considerations which motivate imposition of strict liability on those who create risk and obtain profit by placing defective products on the market do not apply to successor corporations. The successor corporation had no part in the creation of the risk presented by its predecessor's products and, except in a very remote way, does not profit from the sale of those products. The successor has neither invited the public to use its predecessor's products nor represented to the public that those products are safe and suitable for use.

I would affirm the trial court's grant of summary judgment to Stanlabs Pharmaceutical Company.

UTTER and DIMMICK, JJ., concur with PEARSON, J.

Reconsideration denied January 3, 1985.