IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| NOHEMI RICHARDSON, AS PERSONAL REPRESENTATIVE OF THE ESTATE OF JOEL V. RODRIGUEZ, | ) ) ) ) ) | No. 39791-2-III |
| Appellant, | ) ) | |
| V. | ) ) | |
| IRVIN DEAN CALLAHAN; NANCY R. CALLAHAN; CALLAHAN AG, LLC; CALLAHAN DAIRY, LLC; AND CALLAHAN ORCHARDS, LLC; ABC COMPANIES 1-100; JOHN and JANE DOES 1-100, | ) ) ) ) ) ) ) ) | UNPUBLISHED OPINION |
| Respondents. | ) ) ) | |

FEARING, J. — On November 20, 2015, Eduardo Valencia, an employee of

Callahan Manufacturing, Inc., shot and killed co-employee Joel Rodriguez inside the

manufacturing company's shop. In the suit on appeal, Nohemi Richardson, the personal

representative of Rodriguez's estate, recognizes that the employer of the two workers,

Callahan Manufacturing, holds immunity. Therefore, Richardson seeks to impose

liability on the owners of Callahan Manufacturing, Dean and Nancy Callahan, who also

personally own the shop property and work for Callahan Manufacturing.  Richardson

asserts that the Callahans breached a duty, owed as owners of the property, to protect

Rodriguez from Valencia.

In response to Nohemi Richardson's action, Dean and Nancy Callahan assert

immunity afforded co-employees under Washington's Industrial Insurance Act, (IIA),

Title 51 RCW.  Richardson maintains that the Callahans, despite being co-employees,

acted in a separate role as landowners such that the IIA dual persona doctrine withholds

immunity.

Nohemi Richardson also sues three limited liability companies, Callahan

Orchards, LLC, Callahan Dairy, LLC, and Callahan Ag, LLC (the LLCs).  A child of

Dean and Nancy Callahan respectively owns each limited liability company.  Richardson

alleges that the LLCs also controlled the shops and acted in concert with the Callahans

when failing to protect Joel Rodriguez from Eduardo Valencia.

The superior court dismissed all claims against all defendants on summary

judgment.  We affirm.

FACTS

We introduce the parties, including the three defendant LLCs.  We provide many

details of the corporations because plaintiff Nohemi Richardson seeks to amalgamate the

companies as one entity for purposes of tort liability.

2

Nancy and Dean Callahan (the Callahans) begat five children: Kelly Callahan, Richard Callahan, Amy Callahan Davies, Cindy Callahan Carter, and Shaun Callahan. In 1969, Nancy and Dean Callahan founded two businesses: Callahan Manufacturing, Inc. and Royal Turf Farms. Callahan Manufacturing provides welding and fabrication services for farm equipment and trucks. Nancy and Dean own all stock of Callahan Manufacturing and serve as the only board members of the company. Nancy is the President, Secretary, and Treasurer of Callahan Manufacturing, and Dean serves as Vice President.

Callahan Manufacturing operates in a shop located at 219 Balsam St NW, Royal City. Nancy and Dean Callahan own the shop property. Callahan Manufacturing is the sole tenant of the property and shop. Callahan Manufacturing rents the shop on a yearly basis and reports its rental payments as a business expense. Callahan Manufacturing has sole control over the premises, including the shop. Nancy and Dean Callahan did not use the shop for personal reasons unrelated to the manufacturing business.

The parties have not presented to the court, or at least not disclosed its location in the record, the lease from Dean and Nancy Callahan to Callahan Manufacturing. A diagram of the Callahan Manufacturing building shows that Callahan Manufacturing's office attaches to the shop building, with an internal door between the two sections of the building.

Callahan Manufacturing employs Nancy and Dean Callahan. Both receive health insurance through the business. Nancy works for the company as a bookkeeper. Dean supervises the shop operations along with shop foreman, Enrique Juarez, the immediate supervisor of Callahan Manufacturing employees. Dean and Juarez hire and train employees.

Nancy and Dean Callahan founded Royal Turf Farms, as a separate corporation from Callahan Manufacturing, to perform custom farming, including building ponds, deep ripping soil, and discing fields. In its early days, Royal Turf acquired farmland and cattle and expanded its operations to include dairy farming, dairy heifer rearing, and farming fruit orchards.

In 2012, Nancy and Dean Callahan divided the operations of Royal Turf and assigned the orchard business with its land to son Richard Callahan. Richard formed Callahan Orchards, LLC. Nancy and Dean bestowed dairy operations and cattle to son Kelly Callahan, who formed Callahan Dairy, LLC. The family matriarch and patriarch granted Paul and Amie Davies the custom farming operation, and the two formed Callahan Ag, LLC. When Callahan Orchards, Callahan Dairy, and Callahan Ag formed, Royal Turf dissolved. Once Royal Turf dissolved, Dean and Nancy relinquished all control of ownership, management, and operations of the dairy, orchard, and custom farming businesses.

4

Limited liability companies Callahan Orchards, Callahan Dairy, and Callahan Ag operate separately from Callahan Manufacturing. None of the LLCs hold an ownership interest in another. The companies are not jointly managed. Each LLC maintains its own tax ID number, has filed its own taxes, has separate bank accounts, pays its own expenses, earns its own revenue, and collects its own income. The LLCs do not operate under an "umbrella" of Callahan Manufacturing, nor do they share labor or management operations with Callahan Manufacturing.

Although Callahan Orchards and Callahan Dairy do not own or lease any office space at the Callahan Manufacturing shop, Dean and Nancy Callahan allow Callahan Orchards and Callahan Dairy occasional use of office space for the purposes of retrieving mail, processing payroll, reviewing bills, and utilizing the internet. Hillary Callahan performed bookkeeping services for the various companies. Contrary to the assertion of Nohemi Richardson, Hillary did not play a role as personnel manager for any company. Callahan Ag does not use office space at Callahan Manufacturing. Although two of the LLCs may utilize the office, no evidence suggests that those two LLCs use the shop area of the building. Although the LLCs pay their own expenses, they share with Callahan Manufacturing the expense of a QuickBooks program used by all companies. Paul Davies sometimes purchased trucks and truck parts for Callahan Manufacturing and

refabricated some of the trucks.  Each limited liability company received a family discount for any work performed in the shop.

We garner the facts of the shooting from a police report prepared by Sergeant Derek Gregg, who reviewed security camera footage taken on the morning of the homicide.  The video permits us to identify precise times of events leading to the tragic death.  We have not seen the video because neither party sent this court the video.

On November 20, 2015, at 7:00 a.m., Callahan Manufacturing employees and brothers, Joel Rodriguez and Frederico Rodriguez, arrived in the parking lot across from the Callahan Manufacturing shop.  Eduardo Valencia, another Callahan Manufacturing employee, arrived for work at the shop at 7:11 a.m. but did not punch the time clock.  Valencia left the property in his truck at 7:24 a.m., returned to the property at 7:32 a.m., and parked his vehicle in a parking space across from the front door to the Callahan Manufacturing office, the same spot in which he had parked twenty-one minutes earlier.

For four minutes, Eduardo Valencia sat in his truck.  At 7:36 a.m., Valencia exited his vehicle and walked out of sight of a security camera.  During the next nine minutes, Valencia approached Frederico Rodriguez and yelled insults at him.  Joel Rodriguez approached his brother and Valencia.  Valencia reached into his jacket, showed Frederico a pistol, and told Frederico, "I got something here to kill all you fuckers."  Clerk's Papers (CP) at 98.

6

At 7:45 a.m., the video showed Eduardo Valencia returning to his vehicle. He sat in the vehicle for forty seconds before exiting and walked toward the shop. He entered the shop at 7:46 a.m.

At 7:49 a.m., after Dean Callahan had arrived for work, Frederico and Joel Rodriguez conversed with Dean at the front counter of the shop office. The brothers informed Dean that Eduardo Valencia was angry, had a gun, and threatened to kill them. Shortly after, Joel Rodriguez and Dean entered the shop from the office. Joel traveled to the northwest corner of the shop, and Dean proceeded through the shop and exited through the southeast side of the building to summon Paul Davies. Davies, at a nearby carwash, speaks fluent Spanish, interacts with Callahan Manufacturing employees daily, and had earlier assisted Valencia surmount a period of depression.

At 7:50 a.m., Joel Rodriguez and Eduardo Valencia conversed inside the shop. At 7:51 a.m., Valencia exited the shop and ambled again to his truck. At 7:53 a.m., Valencia returned to the shop and shot Rodriguez. Valencia continued through the shop and shot at another employee. He then dashed to his truck and drove from Callahan Manufacturing.

PROCEDURE

Nohemi Richardson, on behalf of the estate of Joel Rodriguez, filed a lawsuit against Dean and Nancy Callahan and the three Callahan limited liability companies,

7

Callahan Ag, Callahan Dairy, and Callahan Orchards. The complaint did not name

Callahan Manufacturing, Inc., the employer of Joel Rodriguez and Eduardo Valencia, as

a defendant. The complaint invoked the general survival statute, the special survival

statute, the wrongful death statute, and the declaratory judgment statute. The complaint

sought to impose liability against Nancy and Dean Callahan on the theories of premises

liability and liability under the Washington Industrial Safety and Health Act (WISHA).

The estate pursued liability against the three limited liability companies on the theory that

the three controlled the shop premises and acted in concert with Callahan Manufacturing.

All defendants filed a motion for summary judgment seeking the dismissal of all

causes of action. Dean and Nancy Callahan each filed declarations in support of the

motion for summary judgment. The defendants filed two memoranda in support of their

motion, arguing that (1) the LLC entities lacked legal responsibility because they were

not possessors or controllers of the land at the time of the shooting, (2) Dean and Nancy

Callahan fulfilled all duties possessed by landowners to protect Joel Rodriguez,

(3) the Callahans incurred no liability for the intentional tortious acts of their employees,

(4) the Callahans enjoyed immunity under the IIA as co-employees of Rodriguez, (5)

WISHA did not impose liability on the limited liability companies because they did not

employ Joel Rodriguez, and (6) no facts supported a finding that the limited liability

companies acted in concert with Callahan Manufacturing or controlled the premises.

In response to the defendants' summary judgment motion, Nohemi Richardson argued that inconsistencies in the defendants' declarations irreparably ruptured the credibility of the defendants, some evidence supported a finding that Callahan Manufacturing and the limited liability companies acted in concert, some evidence supported a finding that Nancy and Dean Callahan employed Eduardo Valencia and that the couple negligently supervised him after learning of his threats to harm others, and Nancy and Dean Callahan as property owners lacked immunity under IIA. The estate also contended that all limited liability companies possessed and occupied the Callahan Manufacturing shop and this possession imposed on them a duty to protect invitees, such as Joel Rodriguez, into the shop.

In opposition to the defense's summary judgment motion, the estate of Joel Rodriguez filed a declaration of expert Jon Groussman. Groussman asserted that Eduardo Valencia engaged in increasingly assertive conduct that Dean Callahan and others should have recognized forebode violent action toward others. Groussman opined that the Callahans and the LLCs owed a duty to protect Rodriguez and failed to perform this duty.

The superior court issued a summary judgment ruling in writing. The letter read:

> While there are some disputed facts, these facts are not material to the ultimate issues on summary judgment.
> Dean and Nancy Callahan are immune under the Industrial Insurance

9

Act.  The "dual persona" and other possible exceptions do not apply. Plaintiffs may not recover from Dean and Nancy Callahan under any theories of premises liability.

Callahan Ag, Dairy, and Orchard did not control or have the right to control the premises or employees of Callahan Manufacturing and are not liable under any theories of premises liability or WISHA.

None of the defendants "acted in concert."

CP at 1309-10.

The estate of Joel Rodriguez filed a motion for reconsideration.  In the motion, the estate contended for the first time that all defendants owed a duty, under WISHA, to provide a safe place for work.  The superior court denied the motion for reconsideration.

## LAW AND ANALYSIS

On appeal, Nohemi Richardson seeks reversal of all the superior court's summary judgment rulings.  She also asks that we strike testimony of witnesses for the defense. The defendants attack the declaration of Richardson's expert, Jon Groussman.  We do not address the admissibility of Groussman's declaration because our rulings render his opinion irrelevant.

Nohemi Richardson's causes of action assume that all defendants knew or had constructive knowledge of the dangerous proclivities of Eduardo Valencia and failed to undertake necessary action to prevent the shooting.  Because of our rulings, we do not address the extent of knowledge of the various defendants or possible measures taken to restrain Valencia.

Witness Credibility

Nohemi Richardson attacks declaration testimony of Paul Davies, Dean Callahan, and Nancy Callahan because the testimony purportedly conflicts with earlier statements including deposition testimony. She goes further and asks that we reverse the summary judgment order solely on the basis of the Callahan family's lack of credibility. We reject this latter request. We address the challenge to request to strike areas of testimony, however, before reaching the merits of the appeal so that we know in advance the facts to use when considering those merits.

The testimony challenged by Nohemi Richardson addressed the limited liability companies' alleged joint possession and use of the Callahan Manufacturing building, the companies' joint operations, and Callahan family members' advance notice of Eduardo Valencia's violent propensities. Nohemi Richardson cites to Dean Callahan's declaration when she criticizes Dean's credibility. Nevertheless, Richardson does not identify what earlier statements Dean made that conflict with the declaration. Richardson did not challenge the declaration testimony of Nancy Callahan when opposing the summary judgment motion. Therefore, we focus on the testimony of Paul Davies, son-in-law of the Callahans and owner of Callahan Ag. We ignore challenged testimony with regard to any of Davies' knowledge of the character and behavior of Eduardo Valencia.

When, at the hearing on a motion for summary judgment, the parties present contradictory evidence or the defending party impeaches the movant's evidence, an issue of credibility is present, provided the contradicting or impeaching evidence is not too incredible to be believed by reasonable minds. *Balise v. Underwood*, 62 Wn.2d 195, 200, 381 P.2d 966 (1963). The court should not, at such hearing, resolve a genuine issue of credibility and should deny the summary judgment motion. *Balise v. Underwood*, 62 Wn.2d 195, 200 (1963).

An issue of credibility arises only if the party opposing the summary judgment forwards evidence which contradicts or impeaches the movant's evidence on a material issue. *Howell v. Spokane & Inland Empire Blood Bank*, 117 Wn.2d 619, 626, 818 P.2d 1056 (1991). To raise an issue of credibility at a hearing on a motion for summary judgment, the nonmoving party must present contradictory evidence or otherwise impeach the evidence of the moving party. *Dunlap v. Wayne*, 105 Wn.2d 529, 536, 716 P.2d 842 (1986). Impeachment of a witness does not establish the opposite of his or her testimony as fact. *Laguna v. Washington State Department of Transportation*, 146 Wn. App. 260, 267, 192 P.3d 374 (2008).

Nohemi Richardson contends Paul Davies' testimony during an April 19, 2023 deposition in the pending suit conflicts with testimony he gave on two other occasions: a pre-suit December 6, 2016 deposition and Eduardo Valencia's criminal trial on January

12

10, 2022.  The testimony surrounds whether Davies performed management functions for Callahan Manufacturing if not the LLCs, in which he held no ownership interest. Richardson characterizes Davies as a manager of Callahan Manufacturing such that all LLCs incur liability.

During the December 6, 2016 deposition of Paul Davies, the relevant dialogue went:

> Q. Okay.  What is your—Do you have a position, rather, at Callahan Manufacturing?
> A.  Not officially, but I'm—*you could say I'm a manager, I suppose*.
> Q. Okay.  And what do you mean but not officially, but you could say I'm a manager?
> A. *We don't really have titles in the company per se*.  I think the plan is—and I can't—I don't know this for sure, but I think the plan is eventually to transition to an ownership position there.  I mean, that's not going to happen until it happened.  So I guess I'm kind of in training, I guess you could say.

CP at 184 (emphasis added).  During this same deposition, Davies declared:

> Q. Okay.  *You mentioned at the outset of this deposition that you were—I didn't write it down—A manager of sorts, I think is what you said.*
> A. *Yeah.  A transient manager*
> Q. *A transient manager, okay.*
> A. *That's my job application for just about every company in the Callahan, transient.*
> Q. Transient manager?
> A. *Translator/manager*.

CP at 202-03 (emphasis added).

13

On January 10, 2022, Paul Davies averred during Eduardo Valencia's criminal trial:

> Q. Did you talk to Mr. Ibarra Valencia about what was going on with him.
> A. I did. Well, I did in the time where he was having problems a year before. I went over to his house and helped him navigate his—it was depression, with issues that he was having with his—at the time it was his brother that had been murdered in Mexico, and he was—he was struggling with that. So I did help him through that. I don't know if you would consider that in a professional or friend capacity. I don't really know. But I did help him with that.
> Q. It's fair to say it might have been a kind of *hybrid position* you were in?
> A. Correct. Correct.

CP at 254-55 (emphasis added).

At the April 2023 deposition, Paul Davies denied he served as a transient manager for limited liability companies:

> Q. Would you consider yourself—Do you know what the term "transient employee" or "transient manager" means?
> A. No.
> Q. So "transient," meaning that you would come and go in a role as an employee or a manager, paid or unpaid
> Do you understand what I'm saying?
> A. Can you rephrase your question, then?
> Q. Yeah, I haven't asked a question yet. I just want to make sure you understand what I mean by "transient employee" or "transient manager."
> Did you ever consider yourself as being a transient employee or

14

manager at Callahan Manufacturing?

    A. No.

    Q. Okay.  You never considered yourself to be a transient manager at Callahan Manufacturing at the time of the shooting; is that correct?

. . . .

    A. I never had any managerial functions or power, if you call it that, for Callahan Manufacturing, ever.  I still don't.

    Q. Right.  But did you ever consider yourself to be a transient manager?  That's the question.

    A. No.

CP at 345-46.

We discern no discrepancy between Paul Davies' criminal trial testimony and his 2023 deposition testimony.  The trial excerpt fails to confirm management duties with any limited liability company.  Instead, Davies agreed that he assumed a friendship role with Eduardo Valencia to help Valencia through a period of depression.  The hybrid position concerned some professional relationship with some friendship role.

We struggle with the import of Paul Davies' 2016 deposition testimony when juxtaposed with the 2023 deposition testimony regarding the term "transient manager," a term to which we are not accustomed.  Conflation of the two depositions suggests that Davies does not employ good English.  In 2016, he spoke of his "job application" being that as "transient manager."  CP at 202-03.  We do not know why he would apply for a job.  Later he changed the phrase "transient manager" to "translator/manager.  CP at 202

We conclude that the 2016 deposition fails to help Nohemi Richardson for two

reasons. First, Richardson questioned Davies in generalities. Richardson did not

question Davies about what, if any, particular duties Davies assumed that corresponded to

his serving as a manager of limited liability companies. Evidence establishes that Davies

provided some translation services for Callahan Manufacturing, but no evidence suggests

that Callahan Manufacturing used Davies for the purpose of supervising employees.

Second, assuming Davies held some duties with Callahan Manufacturing, those duties

simply mean that Callahan Manufacturing sometimes employed the services of Paul

Davies. The presence of shared employees might in some circumstances show one

corporation to be the alter ego of another corporation if other factors exist. Nevertheless,

Richardson does not expressly argue alter ego or shared liability, let alone cite law

supporting such liability.

Summary Judgment Principles

We next outline familiar rules attended to summary judgment motions. We apply

these principles to the various claims of Nohemi Richardson.

Summary judgment is appropriate if the pleadings, depositions, answers to

interrogatories, and admissions on file, together with the affidavits, if any, show that

there is no genuine issue as to any material fact and that the moving party is entitled to a

judgment as a matter of law. CR 56(c). A material fact is one on which the outcome of

the litigation depends in whole or in part. *Ranger Insurance Co. v. Pierce County*, 164

16

Wn.2d 545, 552, 192 P.3d 886 (2008); *Morris v. McNicol*, 83 Wn.2d 491, 494, 519 P.2d 7 (1974). In a summary judgment motion, the burden is on the moving party to demonstrate that there is no genuine issue as to any material fact and that, as a matter of law, summary judgment is proper. *Hartley v. State*, 103 Wn.2d 768, 774, 698 P.2d 77 (1985).

The law renders an important distinction between summary judgment motions brought by the party with the burden of proof on an issue and a party defending on that issue. This distinction looms important in this appeal. For instance, a defendant may move for summary judgment by showing that there is an absence of evidence to support the plaintiff's case. *Young v. Key Pharmaceuticals, Inc.*, 112 Wn.2d 216, 225 n.1, 770 P.2d 182 (1989); *Sligar v. Odell*, 156 Wn. App. 720, 725, 233 P.3d 914 (2010). Stated differently, a party moving for summary judgment can meet its burden by pointing out to the trial court that the nonmoving party lacks sufficient evidence to support its case. *Guile v. Ballard Community Hospital*, 70 Wn. App. 18, 21, 851 P.2d 689 (1993). A complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986).

Special Relationship Liability under *Restatement*

Nohemi Richardson argues on appeal that each defendant incurs liability under

*Restatement of Torts (Second)* § 315(a) because a special relationship existed between

each and Eduardo Valencia such that the Callahans and the LLCs possessed a duty to

control Valencia's conduct and protect Joel Rodriguez. Valencia obviously committed a

crime when killing Rodriguez. Generally, a private person holds no duty to protect others

from the criminal acts of third parties. *Hutchins v. 1001 Fourth Ave. Associates*, 116

Wn.2d 217, 223, 802 P.2d 1360 (1991). Section 315 manifests two exceptions to this

rule. *Brady v. Whitewater Creek, Inc.*, 24 Wn. App. 2d 728, 743, 521 P.3d 236 (2022).

Section 315 declares:

> There is no duty so to control the conduct of a third person as to
> prevent him from causing physical harm to another unless
> (a) a special relation exists between the actor and the third person
> which imposes a duty upon the actor to control the third person's conduct,
> or
> (b) a special relation exists between the actor and the other which
> gives to the other a right to protection.

Section 315 does not designate when such a special relationship exists.

The defendants ask that we decline to review this contention. They contend

Nohemi Richardson never argued before the superior court that a special relationship

existed. We will not review a theory, argument, or claim of error not presented at the

trial court level. RAP 2.5(a); *Lindblad v. Boeing Co.*, 108 Wn. App. 198, 207, 31 P.3d 1

18

(2001). In response, Richardson insists she argued liability under the section 315 special relationship theory.

We agree with the defendants. In response to the defense's summary judgment motion, Nohemi Richardson contended that each of the defendants controlled the shop premises and the Callahan Manufacturing employees. Richardson expounded and insisted that this control placed a duty on each defendant to protect Joel Rodriguez. The duty to protect one from the criminal acts of another based on one's control of premises or workers may overlap with a duty imposed by section 315, but the estate did not assert section 315 as an independent basis for liability. Thus, we do not review what liability any defendant may incur under the *Restatement* section.

## Co-Possessors

Nohemi Richardson contends on appeal that each defendant incurs liability as a co-possessor with Callahan Manufacturing of the manufacturing company's shop where Eduardo Valencia killed Joel Rodriguez. The defendants respond that Richardson failed to raise this argument before the trial court. We disagree. In its summary judgment response, the estate wrote: "[a]ll defendants were co-possessors and occupiers of the premises and owed a duty to ensure invitees were safe on the premises." CP at 120.

We address now potential liability of the limited liability companies for possessing the shop. We later address Dean and Nancy Callahan's potential exposure to

19

responsibility.  Nohemi Richardson argues that, because the limited liability companies

jointly possessed the Callahan Manufacturing building, they owed a duty to protect Joel

Rodriguez as an invitee.  Richardson cites *Restatement* § 344 as having been adopted by

the Washington Supreme Court and supplying the basis for liability.

To recover against the LLCs for premises liability, Nohemi Richardson must

establish two propositions: (1) the companies were "possessors" of the Callahan building;

and (2) a possessor owed a duty to Joel Rodriguez to protect him from the criminal

conduct of Eduardo Valencia.  *Restatement (Second) of Torts* § 328E (1965) defines a

"possessor of land" as:

> (a) a person who is in occupation of the land with *intent to control* it
> or
> (b) a person who has been in occupation of land with *intent to control* it, if no other person has subsequently occupied it with intent to control it, or
> (c) a person who is entitled to immediate occupation of the land, if no other person is in possession under Clauses (a) and (b).

(Emphasis added.)  A related *Restatement* section reads:

> One who does an act or carries on an activity upon land on behalf of the possessor is subject to the same liability, and enjoys the same freedom from liability, for physical harm caused thereby to others upon and outside of the land as though he were the possessor of the land.

RESTATEMENT (SECOND) OF TORTS § 383 (1965).  In turn, section 344 declares:

> A possessor of land who holds it open to the public for entry for his

20

> business purposes is subject to liability to members of the public while they are upon the land for such a purpose, for physical harm caused by the accidental, negligent, or intentionally harmful acts of third persons or animals, and by the failure of the possessor to exercise reasonable care to
> > (a) discover that such acts are being done or are likely to be done, or
> > (b) give a warning adequate to enable the visitors to avoid the harm,
>
> or otherwise to protect them against it.

RESTATEMENT (SECOND) OF TORTS § 344 (1965). The Washington State Supreme Court, in *Nivens v. 7-11 Hoagy's Corner*, 133 Wn.2d 192, 204, 943 P.2d 286 (1997), adopted *Restatement* § 344 with respect to the duty a business owner or possessor of land owes to an invitee.

Nohemi Richardson argues that the evidence, when viewed in a light most favorable to her, establishes that each limited liability company possessed the Callahan Manufacturing building and exercised sufficient control over the shop to impose a duty of care. Richardson highlights that each limited liability company maintained an office, received mail, split some expenses, and handled payroll in the shop. Agents of each limited liability company could use the office adjacent parking lot at any time.

The evidence establishes that a co-employee performed bookkeeping for the respective companies. Paul Davies, owner of Callahan Ag, purchased and fabricated trucks for Callahan Manufacturing and translated for its employees. The evidence does not suggest, however, that Davies performed management responsibilities for Callahan Manufacturing.

21

The evidence underscored by Nohemi Richardson shows that the limited liability companies occupied space and conducted limited business in the Callahan Manufacturing building before the shooting. The evidence does not, however, indicate that any of the companies occupied the premises *with the intent to control*. The evidence shows that Callahan Manufacturing continuously occupied and controlled the shop.

WISHA

On appeal, Nohemi Richardson contends that the three limited liability companies owed a duty to Joel Rodriguez to maintain a safe place to work. Richardson, however, did not assert this theory in the estate's complaint. Richardson first raised the argument in a motion for reconsideration. For this reason, the LLCs ask that this court reject review of the theory. We grant this request.

The trial court holds discretion to decline consideration of a new argument raised for the first time on reconsideration absent a good excuse. *Clare v. Telquist McMillen Clare PLLC*, 20 Wn. App. 2d 671, 685, 501 P.3d 167 (2021). We review a trial court's denial of a motion for reconsideration for abuse of discretion, that is, discretion manifestly unreasonable, or exercised on untenable grounds, or for untenable reasons. *Clare v. Telquist McMillen Clare PLLC*, 20 Wn. App. 2d 671, 685 (2021). Nohemi Richardson did not proffer before the superior court and does not offer before this court any excuse for raising the duty to provide a safe place to work theory for the first time on

22

reconsideration. The superior court did not abuse its discretion in denying the motion for

reconsideration, and we do not address the new theory on appeal.

Callahan Immunity under Industrial Insurance Act

The superior court granted Nancy and Dean Callahan immunity under the IIA

against all claims asserted by Nohemi Richardson. RCW 51.04.010 abolishes most civil

actions arising from job injuries and replaces them with the exclusive remedy of

industrial insurance benefits. RCW 51.04.010; *Meyer v. Burger King Corp.*, 144 Wn.2d

160, 164, 26 P.3d 925 (2001). The statute proclaims in part:

> The state of Washington, therefore, exercising herein its police and
> sovereign power, declares that all phases of the premises are withdrawn
> from private controversy, and sure and certain relief for workers, injured in
> their work, and their families and dependents is hereby provided regardless
> of questions of fault and to the exclusion of every other remedy, proceeding
> or compensation, except as otherwise provided in this title; and to that end
> all civil actions and civil causes of action for such personal injuries and all
> jurisdiction of the courts of the state over such causes are hereby abolished,
> except as in this title provided.

RCW 51.04.010.

RCW 51.24.010 affords the injured worker's employer and co-employees

immunity from suit for job injuries. *Brown v. Labor Ready Northwest, Inc.*, 113 Wn.

App. 643, 647, 54 P.3d 166 (2002). Washington courts extend RCW 51.24.010's

exclusionary provision broadly. *Meyer v. Burger King Corp.*, 144 Wn.2d 160, 164

(2001). Stated differently, courts construe Washington's workers compensation statute

23

stringently in eliminating claims against employers and co-employees. *Evans v.*

*Thompson*, 124 Wn.2d 435, 879 P.2d 938 (1994); *Kimball v. Millet*, 52 Wn. App. 512,

514, 762 P.2d 10 (1988). The worker cannot easily avoid the immunities conferred by

the IIA. *Kimball v. Millet*, 52 Wn. App. 512, 513 (1988).

The IIA affords negligent parties unrelated to the employment relationship no safe

haven. RCW 51.24.030 instead grants the injured worker the opportunity to recover

against a third party. The statute reads:

> If a third person, not in a worker's same employ, is or may become
> liable to pay damages on account of a worker's injury for which benefits
> and compensation are provided under this title, the injured worker or
> beneficiary may elect to seek damages from the third person.

Washington promotes a strong policy in favor of third-party actions in order to make the

worker whole and to reimburse the Department of Labor & Industries for some of its

payments. *Entila v. Cook*, 190 Wn. App. 477, 482, 360 P.3d 870 (2015). This court thus

encounters, on the forehand, a strong public policy favoring withdrawing job injuries

from the common law tort system and protecting employers and co-employees from

liability while, on the backhand, also facing a strong public policy favoring third party

tort actions.

Nancy and Dean Callahan worked for Callahan Manufacturing, the employer of

Joel Rodriguez. Thus, the Callahans were co-employees with Rodriguez. Nohemi

Richardson does not argue otherwise. Instead, Richardson seeks to avoid IIA immunity by characterizing the Callahans as third parties in addition to their being co-employees. The Callahans personally owned the land and shop where Eduardo Valencia killed Rodriguez. Richardson argues that the Callahans functioned in a dual role in the context of the shooting. Richardson thereby employs the dual persona doctrine by advocating liability against the Callahans for their role as owner of the property.

Under the dual persona doctrine, an employer or co-employee may fall within the third person exception to immunity if, but only if, possessing a second persona is so completely independent from and unrelated to the status of employer or co-employee that, by established standards, the law recognizes the second persona as a separate legal person. *Corr v. Willamette Industries, Inc.*, 105 Wn.2d 217, 220-21, 713 P.2d 92 (1986); *Kimball v. Millet*, 52 Wn. App. 512, 513 (1988). This statement of the rule suffers from hyperbole because it introduces a concept of complete independence and a complete unrelationship on a continuum of degrees of independence and relationship and suggests the two personas must be unrelated and independent in the extreme gradation. No decision, however, suggests the party seeking immunity must fulfill such a radical independence. The statement of the rule also references "established standards," but Washington case law provides no guidance as to where to find those standards. *Corr v. Willamette Industries, Inc.*, 105 Wn.2d 217, 221 (1986).

25

If both employees labor under a common employer but the negligent employee did not act in the course of his employment at the time of the injury, he garners no immunity from suit. *Evans v. Thompson*, 124 Wn.2d 435, 444 (1994); *Taylor v. Cady*, 18 Wn. App. 204, 206, 566 P.2d 987 (1977). Workers toil in the same employ when the tortfeasor can show the same employer as the injured person and establish that he acted in the scope and course of his or her employment at the time of injury. *Entila v. Cook*, 187 Wn.2d 480, 487, 386 P.3d 1099 (2017); *Evans v. Thompson*, 124 Wn.2d 435, 444 (1994).

Occasionally the injured worker sues the owner of the land where the injury occurs, and the owner of the land happens to be a co-employee. Nevertheless, the prevailing view still grants the landowner immunity under these circumstances. *Folsom v. Burger King*, 135 Wn.2d 658, 958 P.2d 301 (1998); 2A ARTHUR LARSON, THE LAW OF WORKMEN'S COMPENSATION § 72.82 (1983).

Nohemi Richardson principally relies on *Evans v. Thompson*, 124 Wn.2d 435 (1994). In *Evans v. Thompson*, the estates of two employees of Santana Trucking & Excavating, Inc. (Santana) brought suit against Robert and Amber Thompson, who owned the property where the deaths occurred. The Thompsons were also shareholders, officers, and directors of Santana. Frederick Evans, Daniel Kanning, and a third person, all employed by Santana, inspected the drain system on the property. Evans dropped a calculator into the manhole. He proceeded down the manhole, but did not return.

26

Kanning entered the manhole to find Evans. Both died from methane gas accumulated at the bottom of the manhole. Robert and Amber posited immunity under the IIA because of their co-employment with Santana. The trial court granted summary judgment. The estates appealed.

The Supreme Court posed two questions. First, when the defendants are landowners and a separate legal entity from the employer of a worker, are the defendants immune under the Industrial Insurance Act for breach of their duties as landowners? Second, are the officers and directors of a corporate employer immune, as a matter of law, as co-employees of a person employed by the corporation, even though at least one of the officers and directors is not employed by the corporation and performs no duties for the corporation? The court recognized that, instead of suing the employer corporation, the estates sued entirely separate legal entities, the Thompsons, as individuals. Santana leased the property from the Thompsons. As to the first question, the court ruled that Robert and Amber Thompson, as landowners and distinct legal persons, lacked immunity under IIA.

In addressing the second issue, the Supreme Court recognized that, for Amber and Robert Thompson to be immune as a matter of law, each of them must have been in the same employ as the decedents. The court determined that Amber Thompson was not immune as a matter of law because she was not employed by the corporation or otherwise

performed services for the corporation. She received no wages from Santana. The Supreme Court further concluded that Robert Thompson failed to prove he was an employee of Santana. The Supreme Court remanded for a factual determination of whether the employer and landowner were separate entities.

Two Washington decisions assist Nancy and Dean Callahan, the first being *Folsom v. Burger King*, 135 Wn.2d 658 (1998). The estates of two Burger King employees killed by a third party while at work brought suit against Hatter, Inc., the landowner of the restaurant premises. Hatter, Inc. operated the Burger King franchise where the murder occurred. Edwin Hatter, an employee and sole shareholder of Hatter, Inc., participated in the management, supervision of daily operations, marketing, and financial decisions of the restaurant.

The decedent estates argued that Hatter, Inc. and Edwin Hatter possessed distinct personas as the landowners of the property. Therefore, the IIA did not afford them immunity. According to the estates, Hatter, Inc. and Edwin owed a duty to the employees as occupiers of land, a duty separate from a duty as the employer or co-employee. The trial court granted summary judgment in favor of Hatter because he did not use the premises for purposes other than the restaurant. The Supreme Court affirmed. The high court distinguished *Evans v. Thompson* because the Thompsons used their property for purposes other than business purposes.

28

Another Washington case of relevance is *Kimball v. Millet*, 52 Wn. App. 512 (1988). Clayton Kimball sued Earl and Vina Mae Millet for personal injuries caused by an aggressive bull. A farming corporation owned the raging bull and also employed Kimball and the Millets. The Millets owned and leased to the farming corporation the land on which the raging bull struck Kimball during the course of his employment. This court held the Millets were immune from suit under the IIA. This court rejected Kimball's contention that the Millets faced liability either under a "dual persona" theory or as landlords.

This court in *Kimball v. Millet*, 52 Wn. App. 512, 514 (1988) relied on *Heritage v. Van Patten*, 59 N.Y.2d 1017, 466 N.Y.S.2d 958, 453 N.E.2d 1247 (1983) and *Rauch v. Jones*, 4 N.Y.2d 592, 176 N.Y.S.2d 628, 152 N.E.2d 63 (1958). A New York statute imposed a nondelegable duty upon a property owner to protect against injuries to persons employed in construction work on the premises. In *Heritage v. Van Patten*, 59 N.Y.2d 1017 (1983), the New York court ruled that the statute did not apply to a landowner who was a co-employee of an injured worker in light of an exclusivity provision of workers compensation law making compensation the exclusive remedy of an employee injured by the negligence of another in the same employ. In *Rauch v. Jones*, 4 N.Y.2d 592 (1958), the New York court also applied this rule under the circumstances wherein the co-employee owned the car in which the plaintiff rode when suffering injuries.

Nohemi Richardson suggests that Dean and Nancy Callahan acquired and exercised their rights to use the property for purposes unrelated to Callahan Manufacturing. According to Richardson, the Callahans shared the shop and the adjacent parking lot with their children and their related businesses. They managed the property for the benefit of multiple distinct corporate entities created by the Callahan family for tax and estate planning benefits. Still, the underlying facts remain that the Callahans did not employ the shop property as a home or a place to engage in personal pursuits. The Callahans shared some of the facilities with other businesses in their roles as owners and workers at Callahan Manufacturing.

We do not know the full extent of the property owned by the Callahans in the region of the Callahan Manufacturing shop. Nohemi Richardson suggests the Callahans and Eduardo Valencia lived in the vicinity. The facts, however, show the confrontation to revolve around the shop and the adjacent parking lot used by workers.

Nohemi Richardson wishes to create a question of fact as to whether Dean Callahan performed work for Callahan Manufacturing when the altercation between Eduardo Valencia and the Rodriguez brothers began in the parking lot. Dean then left the premises to enlist Paul Davies to assist. We discern no question of fact. Dean Callahan came to the shop in his role as manager of Callahan Manufacturing. He approached the Rodriguez brothers because of being their boss at Callahan Manufacturing. In short,

Dean toiled within the scope of his employment with Callahan Manufacturing when overseeing the conduct of Eduardo Valencia and the Rodriguez brothers.

We deem important that Nohemi Richardson does not sue because of a defect in the Callahan Manufacturing shop. The death of Joel Rodriguez arose from an employee, who Dean Callahan supervised. Assuming Dean possessed knowledge of the dangerous proclivities of Eduardo Valencia, he gained the knowledge through his role as a manager for the employer, not his role as the owner of the property.

Concerted Action

Nohemi Richardson argues that evidence she submitted raises questions of material fact exist as to whether the Callahans and LLCs acted in concert. The only act or omission that Richardson targets for concerted action liability is a failure to address the security concern posed by Eduardo Valencia. Richardson does not argue that the LLCs acted in concert with Callahan Manufacturing as opposed to the Callahans. We have ruled that the Callahans, as co-employees of Joel Rodriguez, enjoy immunity. The LLCs do not claim that concerted action with a co-employee brings immunity, so we must address whether the LLCs could be liable for concerted action.

Nohemi Richardson asserts that all defendants knew of concerns about Eduardo Valencia. In turn, all defendants maintained an obligation to intervene to protect invitees

31

in the common areas held and used in common by all. We already concluded that Richardson's evidence does not support any inference of joint control.

Nohemi Richardson argues facts beyond the evidence showing the Callahan family businesses acted as one unit also merit concerted action liability. Richardson contends that the "decision" of Dean Callahan and Paul Davies to take no steps to protect invitees on the property exhibited a conscious decision to act "together in an unlawful manner."

Concerted action is not a tort in itself, but is a theory of liability. *Westview Investments, Ltd. v. U.S. Bank National Association*, 133 Wn. App. 835, 853, 138 P.3d 638 (2006). The notion of concerted action under the common law derives from vicarious liability and requires that a plaintiff show "a tacit agreement among defendants to perform a tortious act." *Martin v. Abbott Laboratories*, 102 Wn.2d 581, 596, 689 P.2d 368 (1984). A defendant can be liable for harm resulting from another person's tortious act if the defendant renders substantial assistance to the other in accomplishing a tortious result, and his own conduct, separately considered, constitutes a breach of duty to the third person. *Martin v. Abbott Laboratories*, 102 Wn.2d 581, 596 (1984); RESTATEMENT (SECOND) OF TORTS § 876(C), at § 315 (1977).

For a defendant to be held liable under the theory of concerted action, the plaintiff must show that the defendant:

> (a) does a tortious act in concert with the other or pursuant to a common design with him, or
> (b) knows that the other's conduct constitutes a breach of duty and gives substantial assistance or encouragement to the other so to conduct himself, or
> (c) gives substantial assistance to the other in accomplishing a tortious result and his own conduct, separately considered, constitutes a breach of duty to the third person.

*Westview Investments, Ltd. v. U.S. Bank National Association*, 133 Wn. App. 835, 853 (2006).  Concert of action is a true joint tort in that all acted jointly to produce the harm. *Martin v. Abbott Laboratories*, 102 Wn.2d 581, 596 (1984).

Nohemi Richardson supplies no evidence, and the evidence she forwards leads to no reasonable inference, that any agent of an LLC, let alone Paul Davies, reached an implied agreement to provide no protection from acts of Eduardo Valencia.  No evidence suggests that Davies knew that the Callahans' conduct constituted a breach of a duty to protect others.

## CONCLUSION

We affirm the superior court's dismissal of all claims against all defendants on summary judgment.

A majority of the panel has determined this opinion will not be printed in the Washington Appellate Reports, but it will be filed for public record pursuant to RCW 2.06.040.

No. 39791-2-III
*Richardson v. Callahan*

_____
Fearing, J.

WE CONCUR:

_____
Lawrence-Berry, C.J.

_____
Hazel, J.P.T. 1

---

†Tony Hazel, an active judge of a court of general jurisdiction, is serving as a judge pro tempore of this court pursuant to RCW 2.06.150(1).

34